[No. 899-3.   Division Three.   July 16, 1974.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT L. CULLEY *et al., Petitioners.*

696

*John S. Moore* (of *Velikanje, Moore & Shore*), for petitioners.

*Slade Gorton, Attorney General,* and *Michael A. McKean, Assistant,* for respondent.

GREEN, C.J.—On January 21, 1973, the petitioner, State of Washington, brought this action to acquire 10 acres of land to be used in the future expansion of Yakima Valley College. The land is contiguous to the present campus. By the time of the hearing on the order adjudicating public use and necessity, 9 acres had been obtained by negotiated purchase, leaving 1 acre to be acquired from the respondents Culley, Corpman, Huntzinger, and Long Enterprises, Ltd. After a hearing on the matter, the court on July 6, 1973, entered an order adjudicating public use. Certiorari was granted upon request of respondents Culley and Corpman to review this order.

On review respondents contend: (1) The State of Washington is not a proper party, the proper party being the State Board for Community College Education; and (2) the evidence does not support the entry of an order adjudicating public use and necessity.

■ First, we conclude the State of Washington is a proper party. While the State Board for Community College Education is authorized to bring the action under RCW 28B.50.090, it need not be brought in its own name. The board is an agency of the State of Washington. RCW 28B.50.050; *see Centralia College Educ. Ass'n v. Board of Trustees,* 82 Wn.2d 128, 508 P.2d 1357 (1973). The Director

of General Administration is authorized to acquire real estate on behalf of boards and agencies because he is their agent. RCW 43.82.010. Such acquisitions may be by eminent domain as provided for in RCW 8.04. RCW 43.82.030. Under RCW 8.04, the State of Washington brings the action on behalf of the agency or board and is represented by the Attorney General. The present action was brought in the name of the State of Washington for the use of Yakima Valley College, a community college under the administration of the State Board for Community College Education. The fact that this board has the power of eminent domain under RCW 28B.50.090 does not require that the action be titled in the name of the state board. Although title to real property may vest in the state board under RCW 28B.50.300, as asserted by respondent, it does not prevent the State of Washington from bringing the action on its behalf.

Second, we find the evidence sufficient to support the entry of the order adjudicating public use and necessity.

■ Before such an order can be entered, it must be shown that (1) the proposed use is really a public use; (2) the public interests require it; and (3) the property appropriated is necessary for the proposed public use. *State ex rel. Lange v. Superior Court,* 61 Wn.2d 153, 156, 377 P.2d 425 (1963); *State v. Hatchard,* 49 Wn.2d 442, 302 P.2d 478 (1956). Respondents contend the evidence is insufficient to support any of these requirements.

With respect to these requirements, Dr. Thomas Deem, President of Yakima Valley College, was the sole witness on behalf of the petitioner. No witness was called on behalf of respondents. He testified that the college is expanding in a southerly direction and that the acquisition of the 10 acres, which includes respondents' 1 acre, is in the path of that expansion. Further, the plans for the City of Yakima reflect an expansion of Yakima Valley College within the area of acquisition.

The minutes of the state board authorizing the acquisition contain a project narrative that in part states:

Costs of site properties contiguous to the present campus are expected to increase from the current level of about $72,000 per acre to $80,000 per acre within the next 2-4 years. Justification for the expansion of existing campus is made on the basis that the college is located on 24 acres with an enrollment of over 3000 students. Standards indicate that a community college campus should contain 40 acres plus 2 acres for each 100 students enrolled. The ideal size for this institution would thus be 60 acres.

Among the properties now available for acquisition is a parcel on the southeast corner of 16th Avenue and Nob Hill Boulevard. Two buildings and a small parking lot are located on the site. Acquisition of this property by the district would satisfy two purposes: acquisition of property within the limits of an area identified for campus expansion, and use of existing structures on the property. One of the buildings is suited for use as a receiving warehouse and storage area. Such a warehouse is identified as a future capital project in the 1971-73 biennium, and could properly be developed upon the acquisition of this property.

This narrative is corroborated by Dr. Deem who testified that the expansion program was necessary because (1) the ratio of students to campus area based upon studies in other states indicates their campus is too small;[1] (2) the present facilities are too small for the current college program;[2] (3) the priority needs of Yakima Valley College

---

[1] "The original campus was on these 20 acres and then they obtained property just south to bring it up to approximately 25 acres. When they originally requested this project, they followed a rule of thumb of the California system which set up a basic campus of 40 acres and then they allowed 2 acres per every hundred students. And they estimated at that time 3,000 students and if you divide that by a hundred and you get 30 and you multiply 30 times 2 and you get 60. And even if we acquire all these 10 acres, we're still below the 40 acres or we're below the 40/60 acres, or we're below the hundred if you total those two together. There are other various rules of thumb in other states and there's no rule of thumb that says you have this small a campus for the number of students that you have. So I would definitely say we need this property."

[2] "In regard to academic space—overall we are still tight on use of space. In regard to academic space, we're somewhat over necessary space although we've some renovation projects which will help us make

established by the state board as compared to other community colleges in the state are relatively high;[3] and (4) in-

better utilization of that especially in the Vo Tech area. Science space, we're fairly tight on it. We've fairly high utilization. Library space we're all right. Student union space, we're very tight; in fact, we're so tight that our dormitories aren't full and the dormitories aren't set up to have offices but we're officing people over to the clubs and other kinds of services such as Veterans Co-ordinators or Community Action Group over into dormitories and setting up offices over there. Our book store is all right; our gym is very tight, utilization is very high. Our nursing programs, including dental hygiene, is very tight; in fact dental hygiene is off the campus right now and it should be on our campus because the students not only take dental hygiene special courses, they take other kinds of courses also and they need to be on the campus.

". . . Our Vo Tech programs is [sic] very tight; we've high utilization. Right now our electronics lab is too small and needs to be double. We have general lab needs in engineering programs, political science, engineering, and Ag. And our community college also offers programs in the evening to adults, to people already employed, in regard to upgrading and retraining these kinds of people. And also we perform community services and have special kinds of programs in that area. My Vo Tech dean pointed out that we certainly could use space, a portion of a general lab for upholstery, furniture refinishing and home maintenance. Faculty offices, we're tight. Administration counseling offices, we're tight. Business administrations and records office, we're very tight. Maintenance buildings, receiving warehouse and that kind of thing, we're tight; and parking, we're extremely tight. And we've gap procedures in the state and our gap procedures have shown that we're short in Vo Tech area."

[3]"And they allow a certain space or stations for a thousand F.T.E. students. And [sic] "F.T.E." student is full time equivalent student which is one student that takes 15 quarter hours during the quarter, for the first thousand F.T.E.'s. Then after that, a thousand F.T.E.'s, there are certain formulas that they use for determining the space. And the gap procedure is to determine what is—On how many F.T.E. students you have, what that total is, total space needs. And they have it broken down into certain areas, most of the kinds of areas that I've just mentioned here. And they say here's what you should have; here's what you have. And then they get the difference and the difference is a gap. And then they compute a percentage on that gap to relate that percentage to other institutions with their percentage gaps. And then they "prioritize" according to the needs. One of our priorities for assembly meeting rooms was 82 percent. That's extremely high; one of the highest. But right now they are not building assembly rooms; they are building—And the main emphasis on our funding for '73-75, including the R-31 referendum bonds that were passed by the public are for vocational technical programs. So even though we had a high gap

creasing enrollments will exaggerate the present space shortage.[4]

Dr. Deem also stated that the policy of the state board was to first allocate funds for land acquisition and then approve construction plans for its specific long-range use. Such long-range plan is under study. Pending development of that specific long-range plan, interim uses of the property include: (1) an agricultural plot; (2) a track for use by the physical education department, replacing their present use of a high school track field; and (3) parking. He also testified that on a long-range basis a portion of the 10 acres would be used for the construction of a building in phase 2 of their mechanics project.

We now consider the requirements outlined in *State ex rel. Lange v. Superior Court, supra*. With respect to the question of whether the use in question is actually a public use, the court in *State ex rel. Tacoma School Dist. 10 v. Stojack*, 53 Wn.2d 55, 63, 330 P.2d 567, 71 A.L.R.2d 1064 (1958), said:

---

in percentage or high percentage gap for assembly meeting rooms, they said, no, we're not going to have this right now. We're going to concentrate on Vo Tech because that's where the main needs really are and that's where the main education is. And so we've a high vocational technical gap of a little over 55 percent and that was one of the highest in the state and we are getting some funding for this biennium; at least it's up to the legislature now. But the State Board has put us on a high priority which goes to the state legislature."

[4] "You probably read that in the paper this morning. Yea, this morning it had been in the paper and I announced that at the Board meeting last night. We had projected an annual F.T.E. enrollment of 2,910. Now, that's total counting on and off campus day and evening. That was quite a large increase over last year. We have had an increase this year over last year and our projecting increases next year and in the following years. The 2910—we've had fairly conservative estimates on our projections in relation to State funding. This past year we were not quite as conservative as usual in our projections and we estimated 2910. And there's a 3% band there leeway and we'd to meet 2,822 annualized F.T.E.'s. And we did not meet that. We had 2781. So based on their computation according to formula we had, we have to return 10,192 I think it is. But our enrollments have been increasing and we project it will be continued to be increasing."'

Public education is a public use for which private property may be appropriated under the power of eminent domain.

This statement is reinforced by RCW 28B.50.090 authorizing the state board to acquire property by eminent domain.

On the question of whether the public interests require the use, it is clear that the present 24-acre site of the community college is inadequate for its enrollment, according to comparative studies of other systems. Even after this acquisition, the campus will have less acreage than the college should have based upon its enrollment.[5] Further, space shortages in the existing facilities require the use of off-campus facilities. If the community college system is to provide effective education, it is in the public interest to provide adequate facilities.

■ With respect to the matter of whether the subject properties are necessary to accomplish the public use, the governing standard was set out in *State ex rel. Tacoma School Dist. 10 v. Stojack, supra,* at page 64:

Generally, the action of a public agency or a municipal corporation having the right of eminent domain in selecting land for a public use will not be controlled by the courts, except for a manifest abuse of discretion, violation of law, fraud, improper motives, or collusion. This court has frequently held that, in eminent domain proceedings, selection of land to be condemned by the proper public agency is conclusive in the absence of bad faith, or arbitrary, capricious, or fraudulent action.

We find no evidence of bad faith, arbitrary, capricious or fraudulent action. The determination to acquire the property is based upon the present and future needs of the college.

The fact that Dr. Deem did not present specific plans for the long-range use of the property is not, under the evidence presented, fatal to petitioner's acquisition as con-

[5]Compare: In *State ex rel. Tacoma School Dist. 10 v. Stojack,* 53 Wn.2d 55, 330 P.2d 567, 71 A.L.R.2d 1064 (1958), a trial court order approving the acquisition of 76 acres for a senior high school with 600-1,500 students was affirmed.

tended by respondents. *See State ex rel. Lange v. Superior Court, supra; State ex rel. Agee v. Superior Court,* 58 Wn.2d 838, 365 P.2d 16 (1961). Moreover, it is implicit from his testimony that a general overall plan for the use of the property does exist, namely, facilities will be constructed to relieve the pressure arising from existing space shortages. This overall conclusion is not refuted by the evidence; respondents offered no contradictory evidence. Furthermore, interim plans do exist. Reasonable necessity for use in a reasonable time is all that is required. *Tacoma v. Welcker,* 65 Wn.2d 677, 684, 399 P.2d 330 (1965).

Finally, it is contended that the order adjudicating public use and necessity does not contain sufficient findings of fact on each of the foregoing requirements. The court found that the property to be acquired "is necessary for a public use of the State of Washington, to-wit: for a campus site for Yakima Valley College." RCW 8.04.070 provides:

> [I]f the court . . . is . . . satisfied by competent proof that the contemplated use for which the lands . . . are sought . . . is really necessary for the public use of the state, it shall make and enter an order . . . adjudicating that the contemplated use . . . is really a public use of the state.

This is precisely what the trial court did. The order entered is in almost the precise form printed in and immediately following RCW 8.04.070. The order is adequately supported by uncontradicted testimony. Thus, we find no merit to respondents' final contention.

The order is affirmed.

MUNSON and McINTURFF, JJ., concur.