[No. 44213.   En Banc.   July 28, 1977.]

MARINO PROPERTY CO., ET AL, *Appellants*, v. THE PORT OF SEATTLE, ET AL, *Respondents*.

*Monheimer, Schermer, Van Fredenberg & Smith,* by *Roland W. Johnson, J. Dimmit Smith,* and *Theodore M. Therriault,* for appellants.

*Preston, Thorgrimson, Ellis, Holman & Fletcher,* by *Larry M. Carter, Eric Redman,* and *Michael B. Crutcher,* for respondents.

STAFFORD, J.—Plaintiffs Marino Property Co., Roger Benson, and Otto Rasmussen (Marino) brought a claim for injunctive and declaratory relief against defendants Port of Seattle (Port) and the City of Seattle (City). The United States General Services Administration (GSA), which sold Piers 90 and 91 (Piers) to the Port, is not a party. Marino appeals from a summary judgment for defendants. We affirm the trial court.

Summary judgment is available only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). In reviewing a summary judgment we must consider the evidence and all reasonable inferences from the evidence in favor of the nonmoving party, in this case Marino. *Wilber Dev. Corp. v. Les Rowland Constr., Inc.,* 83 Wn.2d 871, 523 P.2d 186 (1974); *Morris v. McNicol,* 83 Wn.2d 491, 519 P.2d 7 (1974).

The Piers, located on Elliot Bay in the City, occupy approximately 200 acres and consist of two large landfilled piers which provide 2 miles of berthing capacity for ocean vessels, approximately 70 buildings, a steam heating plant, a fuel storage and distribution system, railroad yards, roads, large open storage areas, and adjoining tidelands. The Port began construction of the Piers in 1913. The United States condemned the Piers for use by the Navy in 1942. Thereafter the property was used as a supply depot and major marine terminal until 1970 when the Navy abandoned operations at the site. The Navy ultimately

declared the property surplus and the Port operated the facilities under a license agreement with GSA as a marine terminal and warehouse facility for general cargo and automobiles. The Port rented facilities to numerous commercial tenants who are engaged in a variety of marine–related activities. At the same time, the Port began negotiations with GSA to reacquire the Piers.

As early as 1972, while the Port was negotiating with GSA, residents of Magnolia Bluff and Queen Anne Hill, the neighborhoods located on either side of the Piers, expressed concern about the proposed reacquisition and redevelopment of the property. In response to this expression of neighborhood concern, the Port held a series of community meetings to discuss the proposed reacquisition. As a result of these meetings the Port adopted a policy which emphasized cooperation with the neighboring community and sought citizen participation concerning proposed development of the Piers. Special emphasis was placed on potential adverse environmental effects. The Port pledged to maintain existing uses of the Piers until at least the early 1980's. It also agreed to establish a buffer strip around the perimeter of the property and not to fill or otherwise develop any substantial part of the property currently covered by water.

In connection with this policy the Port also agreed to transfer to the City restricted title to a small portion of the Piers' westerly tidelands that are entirely covered by water. Although this underwater area is an integral part of the Piers complex to be reacquired, it has been arbitrarily denominated parcel A for ease of reference. The Port planned to retain extensive easements in parcel A which included use for dredging, continued use for navigation, and the right to construct bulkheads along the shoreline. The City would hold parcel A solely as an "open–water park." If the City attempted to develop parcel A in any way, the property would revert to the Port.

Following lengthy negotiations, in June of 1975 GSA accepted the Port's offer of $15,335,000, $10,115,000 in cash plus a warranty deed to Pier 36 and the apron of Pier 37,

which had an agreed value of $5,200,000. It should be noted that the Port originally offered to purchase the Piers which include parcel A long before the concept of the open–water park was conceived. After the community meetings, the Port did explore the possibility of acquiring the Piers without parcel A (*i.e.,* the westerly tidelands), but GSA rejected the idea and required the Port to purchase nothing less than the entire complex. Therefore, the Port was contractually obligated to purchase the entire Pier terminal area, or nothing.

The proposed conveyance of parcel A to the City is an act entirely separate from the Port's acquisition of Piers 90 and 91 from GSA. Parcel A is not a separate portion of property having an existence independent of the Piers. Rather it is an integral part of the Piers terminal area. The proposed "open–water park," *i.e.,* parcel A, consists of approximately 23 acres or 12 percent of the total 200 acres of the terminal property. Marino contends the value of parcel A is $800,000 or about 5 percent of the total $15,335,000 value of the property.

In March 1975, GSA issued a final Environmental Impact Statement (EIS) in compliance with the National Environmental Protection Act (NEPA) which concluded that the reacquisition would have no significant environmental impact. In the summer of 1975, the Port prepared an Environmental Assessment and Declaration of No Significant Impact under the State Environmental Policy Act (SEPA). The declaration concluded that there would be no significant environmental effects caused by the action of transferring the property from GSA to the Port because the Port was merely reacquiring the facility to continue its existing uses.

The Port had planned to issue $16,000,000 in general obligation bonds to be used in the reacquisition of the Piers and for rehabilitation, maintenance, and improvements. The sale of the bonds was postponed, however, because on the day before the bids were to be opened Marino filed this action for injunctive and declaratory relief against the Port

challenging legality of the issuance of the bonds and of the proposed restricted transfer of parcel A as well as alleging failure to comply with SEPA in the proposed reacquisition and contemplated improvements.

Marino's primary interest in the activities of the Port is as the owner of the "Magnolia Tidelands," a parcel of waterfront property lying immediately to the west of parcel A, the proposed open–water park. For the purpose of reference only, the Marino property has been denominated parcel B. Marino had offered to sell the "Magnolia Tidelands" to the Port in January of 1975. This would have given the Port an opportunity for westward expansion from Pier 91. However, the Port Commissioners decided against such expansion (partly as a result of the neighborhood pressure and criticism), and Marino's offer was declined.

The gravamen of Marino's complaint is the proposed transfer of parcel A to the City and its preservation in a natural and undeveloped state. The restricted gift to the City of the open–water park would appear to effectively preclude commercial or industrial development of parcel B because major rail and truck access would be impossible without traversing parcel A.

In February 1976, the Port filed a motion for summary judgment. An order was entered granting the motion against Marino on all issues. The Port stipulated to the entry of an injunction which prohibited expenditures for improvements to the Piers until an EIS had been completed covering all proposed improvements. But, reacquisition of the Piers was not enjoined. Marino appealed the order directly to this court, but sought no stay of the trial court order or any injunctive relief from this court. On June 29, 1976, the Port issued general obligation bonds to cover only the cost of reacquisition, and GSA transferred title to the Port. In August 1976, the Port completed a draft EIS on proposed improvements, pursuant to court order. This court retained jurisdiction of the case under RAP 4.2 on November 5, 1976.

We consider the legality of the Port's actions under two headings: the reacquisition of the Piers' terminal complex and the proposed disposition of parcel A to the City.

## I. REACQUISITION

■ Clearly the Port has the power to issue bonds to finance the reacquisition of property suitable to its purposes. RCW 53.08.010, .020, and 53.36.030.[1] Appellant contends, however, that the portion of the bond issue attributable to reacquisition of parcel A is illegal because the gift to the City is not a proper municipal purpose. We do not agree with this oversimplified assertion. Marino has confused two separate issues: (1) the purpose of the reacquisition of the Piers is to provide additional Port facilities of which parcel A is but a minor part with no separate existence of its own, and (2) the subsequent disposition of parcel A is a separate issue from the reacquisition and financing of the Piers and is governed by different statutes.

---

[1]RCW 53.08.010

"Acquisition of property—Levy of assessments. A port district may acquire by purchase . . . all lands, property, property rights, leases, or easements necessary for its purposes . . . and may levy and collect assessments upon property for the payment of all damages and compensation in carrying out its purposes, and such right shall be exercised in the same manner and by the same procedure as provided for cities of the first class insofar as consistent with this title, . . ."

RCW 53.08.020

"Acquisition and operation of facilities. A port district may . . . purchase, acquire, add to, maintain, conduct, and operate sea walls, jetties, piers, wharves, docks, boat landings, and other harbor improvements, warehouses, storehouses, elevators, grainbins, cold storage plants, terminal icing plants, bunkers, oil tanks, ferries, . . . locks, tidal basins, . . . conveyors, administration buildings, fishing terminals, together with modern appliances and buildings for the economical handling, packaging, storing, and transporting of freight and handling of passenger traffic, rail and motor vehicle transfer and terminal facilities, water transfer and terminal facilities, . . . and any combination of such transfer and terminal facilities, commercial transportation, transfer, handling, storage and terminal facilities, and improvements relating to industrial and manufacturing activities within the district, and in connection with the operation of the facilities and improvements of the district, it may perform all customary services including the handling, weighing, measuring and reconditioning of all commodities received. . . ."

RCW 53.36.030

"Indebtedness—Limitation. A district may at any time contract indebtedness or borrow money for district purposes and may issue general obligation bonds

■ Appellant also argues that RCW 53.20.030,[2] which provides for intergovernmental harbor improvements, does not authorize the Port to acquire parcel A for the purpose of giving it to the City because it is not the intended site of harbor improvements. Once again, appellant has confused the two legal issues, *i.e.,* reacquisition of the Piers and disposition of parcel A. RCW 53.20 provides for planning, ownership, and financing of harbor improvements. Specifically, RCW 53.20.030 allows the Port to spend money for harbor improvements, the title to which may be vested in the City. However, it is not necessary for a port district to adopt a comprehensive plan of harbor improvements, as provided in RCW 53.20, *prior* to purchase of the property under RCW 53.08.010. *State ex rel. Gorton v. Port of Walla Walla,* 81 Wn.2d 872, 505 P.2d 796 (1973). The Port must comply with this statute when improvements are *made,* not when the property is *acquired.* Nevertheless, in this case the Port did develop a harbor improvement plan which included port facility improvements as well as a buffer zone in the form of an open–water park between its commercial activity and the nearby Magnolia and Queen Anne residential districts. The Port clearly has the power to reacquire the Piers and to issue bonds to finance that reacquisition.

■ Next, Marino claims that the issuance of the bonds, the reacquisition of the property, and the taking over of an existing use at the Piers are major actions significantly affecting the quality of the environment under SEPA. Marino argues that it was clearly erroneous for the Port to prepare a Declaration of "No Significant Environmental

therefor . . . Any district may issue general district bonds evidencing any indebtedness, payable at any time not exceeding fifty years from the date of the bonds."

[2]RCW 53.20.030
"Improvements—Ownership of. No improvements shall be acquired or constructed, by the port district, unless such improvements shall, when completed, be the property of such port district, . . . any city within such port district, . . . and the funds of such port district may be expended in the acquirement or construction of any harbor improvement embraced in such general plan adopted as in this chapter provided in conjunction with . . . any city in such port district, . . ."

Impact" (a negative declaration) rather than an EIS. Consequently, we must determine whether the Port's threshold determination that it need not prepare an EIS is in fact "clearly erroneous" in view of the record submitted and the public policy contained in the legislative act. This court has said that a negative declaration is "clearly erroneous" if, considering the public policy of the legislative act, the reviewing court can firmly conclude on the record that a mistake has been committed. *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 275-76, 552 P.2d 674 (1976). With this standard of review in mind, we look to the mandate of SEPA.

SEPA requires preparation of an EIS prior to the undertaking or approving of any major action which will have a significant effect on the quality of the environment. RCW 43.21C.030. As we said in *Norway Hill* at page 278

> Generally, the procedural requirements of SEPA, which are merely designed to provide full environmental information, should be invoked whenever more than a moderate effect on the quality of the environment is a reasonable probability.

Thus, the question is whether the issuance of the bonds, the reacquisition of the property, and the continuation of existing uses at the Piers are actions which will have more than a *moderate* effect on the quality of the environment.

In this determination we are assisted by chapter 197-10 of the Washington Administrative Code, the final SEPA guidelines. Although these guidelines became effective January 16, 1976, approximately 4 months after this action was filed, the legislatively mandated regulations establish a uniform state policy with respect to the requirements of SEPA and suggest a logical interpretation thereof.

WAC 197-10-170 provides for "categorical exemptions," that are governmental activities which are not major actions and are exempted from the threshold determination and EIS requirements of SEPA. Included in these exempted actions are the issuance of bonds by a government agency, WAC 197-10-170(7)(d), and the purchase or

acquisition of any right to real property by an agency, WAC 197–10–170(9)(a).

While reacquisition of the Piers, financed by the issuance of bonds, will involve a change of *ownership* and title, it will not cause a change in the existing *use* of the marine terminal. The port facilities, including parcel A, will continue to be used in exactly the same manner as they have been since 1970 when the Port began leasing the terminal from the federal government. In this regard, it is important to note that it is the *use* of property to which SEPA is directed, not its *ownership.*

■ Appellant complains that after the Port obtained use of the complex in 1970 it intensified operations by accepting a number of large tenants, transforming it from a naval supply depot to a modern commercial cargo facility. It is charged that none of these actions have had an environmental review. However, whether these were major actions significantly affecting the environment should have been determined at an earlier date. The activities of which Marino now complains have occurred on a continuing basis since prior to the effective date of SEPA in August of 1971. The failure to proceed in a timely manner on the ground that a governmental project violates SEPA may be barred by the doctrine of laches. *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 275, 525 P.2d 774 (1974). Appellants have slept on their rights for over 4 years while commercial operations at the Port were being increased. It is ironic that they now seek to use SEPA to protect their developmental interests in their own property, parcel B, rather than the environmental interests of the citizens of the area. If Marino wishes to complain of existing ongoing uses at the Piers, its complaints are more properly addressed to the Department of Ecology.

■ We find the issuance of the bonds, the reacquisition of the property, and the continuation of existing uses of the Piers will have no effect on the quality of the environment and thus are not major actions significantly affecting the environment which require an EIS under SEPA. Neither

the Port nor the trial court committed a mistake in making this determination. Marino's environmental interests are fully protected by the trial court's injunction forbidding expenditures by the Port for future development or improvement of the Piers until an EIS covering the matters has been completed.

## II. DISPOSITION

Under RCW 39.33.010,[3] the Port has the power to "sell, transfer, exchange, lease or otherwise dispose of" property to another municipality after it has been declared surplus at a superior court hearing. Nevertheless, Marino contends that a gift to another municipality or political subdivision does not come within the provisions of this statute.

Before determining the applicability of RCW 39.33.010 to the transfer of title to parcel A, we must consider the present status of the property as well as the nature of the disposition. Prior to the trial court's ruling, the Port declared its intention to convey parcel A to the City, declared the property surplus and executed a proposed deed. The deed, as yet undelivered, conveys an unusually restricted title to the City. The Port actually retains most of the indicia of ownership. For example, it retains easements over the parcel for the purpose of dredging and for

---

[3]RCW 39.33.010

"Sale, exchange, transfer, lease of public property authorized—Section deemed alternative. (1) The state or any municipality or any political subdivision thereof, may sell, *transfer,* exchange, lease *or otherwise dispose of* any property, real or personal, or property rights, including but not limited to the title to real property, to . . . any municipality or any political subdivision thereof . . . on such terms and conditions as may be mutually agreed upon by the proper authorities of the . . . subdivisions concerned: *Provided,* That such property is determined by decree of the superior court in the county where such property is located, after publication of notice of hearing is given as fixed and directed by such court, to be either necessary, or surplus or excess to the future foreseeable needs of the state or of such municipality or any political subdivision thereof concerned, which requests authority to transfer such property.

"(2) This section shall be deemed to provide an alternative method for the doing of the things authorized herein, and shall not be construed as imposing any additional condition upon the exercise of any other powers vested in the state, municipalities or political subdivisions." (Some italics ours.)

unrestricted navigation. Further, it reserves the right to construct bulkheads along the shoreline. The City is also required to hold parcel A in its natural state as tidelands entirely covered by water, although it is denominated an "open–water park." The City is prohibited from developing parcel A in any way. Violation of these terms will cause title to the parcel to revert to the Port.

█ As noted above, RCW 39.33.010 authorizes the Port to "sell, transfer, exchange, lease or otherwise dispose of" surplus property to another municipality. Obviously, conveyance of the restricted title to parcel A is not a "sale," "exchange," or "lease." Therefore, it must come within either the terms "transfer" or "otherwise dispose of" to be authorized by RCW 39.33.010. The word "transfer" is not defined in the statute and so it must be given its usual and ordinary meaning. *Dominick v. Christensen,* 87 Wn.2d 25, 27, 548 P.2d 541 (1976); *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 47, 541 P.2d 989 (1975). We frequently refer to dictionaries to ascertain the common meaning of statutory language. *Garrison v. State Nursing Bd.,* 87 Wn.2d 195, 196, 550 P.2d 7 (1976). We note the word "transfer" is generally defined to include a gift:

> 1 a: The conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process

*Webster's Third New International Dictionary* (1968).

> 15. A conveyance, by sale, gift, or otherwise, of real or personal property, to another.

*Random House Dictionary of the English Language* (1967).

> To convey or remove from one place, person, etc., to another; pass or hand over from one to another; specif., to make over the possession or control of (as, to transfer a title to land); sell or give.

Black's Law Dictionary (4th ed. rev. 1968).

Under the unique and limited circumstances of this case, *i.e.,* the conveyance by the Port of restricted legal title to a small portion of tidelands that is an integral part of the

entire Pier complex which the Port was contractually obligated to purchase, we hold that the gift to the City is a "transfer" within the contemplation of RCW 39.33.010.

At this time we make no decision as to whether the contemplated intergovernmental transfer of title is authorized as surplus property. That issue is yet to be resolved by the Superior Court at the hearing required by RCW 39.33.010 and is not ripe for our determination.

Finally, appellant Marino argues that the gift of parcel A to the City is a major action significantly affecting the environment which requires an EIS under SEPA. Our previous discussion of SEPA and the SEPA guidelines, in regard to the total reacquisition, is applicable here as well. WAC 197-10-170(9)(b) provides a categorical exemption for the transfer of property between governmental entities if the property is not subject to an authorized public use. Parcel A is not presently subject to any authorized public use, nor was it subject to an authorized public use when owned by the Navy.

As with the issuance of the bonds, the reacquisition of the property, and the continuation of existing uses at the Piers, the *gift* of parcel A to the City will not have even a moderate effect on the quality of the environment. Parcel A will continue to be used in exactly the same manner as it is now. The transfer of bare legal title from the Port to the City has no impact as contemplated by SEPA.

Having fully reviewed the material submitted for and against the Port's motion for summary judgment, we find no genuine issue of material fact and affirm the trial court's holding that the Port is entitled to summary judgment as a matter of law.

WRIGHT, C.J., HAMILTON, UTTER, BRACHTENBACH, DOLLI-VER, and HICKS, JJ., and COCHRAN, J. Pro Tem., concur.
ROSELLINI, J., concurs in the result.

Petition for rehearing denied October 18, 1977.