[No. 4446–II.   Division Two.   July 31, 1981.]

THE STATE OF WASHINGTON, *Appellant,* v. GERALDINE V. HUTCH, *Respondent.*

*Kenneth O. Eikenberry, Attorney General,* and *Steven P. Recor, Assistant,* for appellant.

*Paul Sinnitt, Sinnitt, Teitge & Sinnitt,* and *G. Tim Martin,* for respondent.

REED, C.J.—Both the State and defendant, Geraldine Hutch, appeal from an order of public use and necessity limited to a light easement. We reverse in part and affirm in part.

Geraldine Hutch, a 71–year–old widow, lives alone in her home immediately behind the left field fence of the Lower Columbia College baseball field in Longview. Prior to 1976, Mrs. Hutch enjoyed a life of relative tranquility, engaging in numerous charitable activities and working in the Japanese garden she had created in her backyard. In 1976, however, her serenity was shattered when Lower Columbia College erected a lighting system on the baseball field. The lighting system, which during the summer is used 5 to 6 evenings a week, consists of 80 floodlights attached to 10 poles erected around the field and produces an average of 50 footcandles[1] in the infield and 30 footcandles in the outfield. The impact of the lights on Mrs. Hutch's property is such that she can read a newspaper clearly while sitting in her living room with all her lights turned off.

Understandably upset, Mrs. Hutch brought suit against the college in June 1976, seeking injunctive relief and damages. From June 1976 until the summer of 1978 the college attempted to negotiate a settlement of this suit. In July 1978, the college offered Mrs. Hutch a cash payment of $7,500 in return for dismissal of her suit. The evidence in the record indicates the college made it clear to Mrs. Hutch that if she rejected this settlement offer, it would initiate condemnation proceedings.[2] Nevertheless, Mrs. Hutch

---

[1] A footcandle is a unit for measuring illumination and equals the amount of direct light thrown by a candle on a square foot of surface located 1 foot away. *Webster's New World Dictionary* (1976).

[2] The letter from the assistant attorney general representing the college, to Mrs. Hutch's attorney, which contained the college's offer, concluded as follows:

"Before concluding this letter, I want to point out as I did in our telephone conversation recently the lack of alternatives available to the college in the event this last settlement offer is rejected. A great deal of time and money has been expended in the past two years in efforts to accommodate Mrs. Hutch. The college has been willing to explore any potential solution to her problem short of

rejected the college's offer.

On September 7, 1978 the college, acting through the Board of Trustees of Community College District 13 (District), requested the State Board for Community College Education (State Board) for authority to acquire, through condemnation, fee title to Mrs. Hutch's property and another privately owned parcel adjacent to the Hutch property. *See* RCW 28B.50.090(13); 28B.50.330. A report prepared by the college staff stated that the property was necessary for the following reasons: (1) as a permanent location for the college's Parent Education and Early Childhood Education Programs, including Headstart; (2) as a means of access to a proposed parking lot; and (3) as a site for future capital facilities. The report prepared by the State Board's staff, after noting the District's request was based on "the college's need for the property and to forestall [a judgment in favor of Mrs. Hutch]", recommended approval of the request because of the "clear findings of public need and necessity." The State Board, after a lengthy debate that included a discussion of Mrs. Hutch's concerns, voted 3 to 2 in favor of the District's request; because 4 votes were needed, however, the request failed. *See* RCW 28B.50.070. Nevertheless, the State Board did approve unanimously a motion to reconsider the District's request at its October meeting. The District was also directed to continue negotiations with Mrs. Hutch.

---

destroying the baseball lighting facility itself. These efforts have not been fruitful. It is therefore my earnest hope that Mrs. Hutch will carefully consider the aforementioned offer of settlement. If, however, the parties to the lawsuit are not able to agree, I must advise you that the college president is prepared to recommend condemnation of the Hutch property to the Board of Trustees and in numerous discussions over the past year the Board has indicated its willingness to proceed with condemnation if no suitable settlement can be arranged. This should come as no surprise inasmuch as I have mentioned this possibility on dozens of occasions in the past two years. It is an action which will be taken by the college with great reluctance. However, given the continuing dissatisfaction of Mrs. Hutch, the planned development of the property adjacent to the Hutch residence and the limited areas available for campus expansion, it is an action which should not, in fairness to both Mrs. Hutch and the community at large, be postponed any further."

Prior to the October meeting, Dr. David Story, president of Lower Columbia College, wrote a letter to Dr. John Terrey, the acting director of the State Board, in response to a request by the State Board for additional information. Much of this 10–page letter focuses on the dispute between Mrs. Hutch and the college regarding the lights. At one point Dr. Story summarized the dispute as follows:

As the Board [of Trustees of District 13] position was presented to the [State Board], the conflict has always been potentially controversial. It represents a classical example of the concept of eminent domain and is not unique or exceptional in any way. Such conflicts are inevitable, and every state has provided some similar mechanism for the resolution of these problems. But what ultimately should prevail? The rights of a respected and responsible individual property owner to enjoy the comfort and privacy of a lovely home or the rights of the many players and spectators to enjoy "the great American pastime"? What could be more classical or more controversial, for that matter. But it is a basic principle of democratic governance that, in a conflict of rights, the "common good" will take precedence over individual rights.

Finally, in a section of the letter entitled "Additional Documentation of Need," Dr. Story concluded:

What is probably more important than a precise description of need is what members of the [State Board] may have intuitively sensed. This reference is to the relationship between the lawsuit and the request for condemnation authority. Although genuine needs exist and can be documented, the most compelling reason can be found in the suit. If Mrs. Hutch is upheld, what remedies are available to the judge? An award of damages and removal or restriction of the lights appear to be the most likely. Thus, one individual is in a position to condition the action of the college in pursuit of its mission. Is this tolerable?

At its October meeting the State Board again reviewed the District's request to condemn Mrs. Hutch's property. The State Board heard testimony from Bill Julius of the Board's staff, Mrs. Hutch's attorney, the assistant attorney

general for the college, and Dr. Story. After another lengthy discussion the Board approved unanimously the following resolution:

> BE IT FURTHER RESOLVED: That the State Board hereby authorizes the commencement of condemnation proceedings, provided, however, that before this authorization can be implemented, the college must first make all reasonable efforts to acquire an easement for the lights as they affect the Hutch property, . . .

What the Board intended by this resolution is a matter of some dispute. Louis Soriano, chairman of the State Board, later testified by deposition that his understanding of the resolution was that it gave the college authority to condemn Mrs. Hutch's property for fee title when the college felt it would be necessary, but at the same time required the college to "make all reasonable efforts" to compensate Mrs. Hutch for the damage to her property. Mrs. Hutch contends that this resolution is further evidence that the sole motivation for seeking condemnation authority was to resolve the dispute over the lights.[3]

After the October meeting the college again approached Mrs. Hutch regarding a settlement. In March 1979, the college offered Mrs. Hutch $12,000 for a light easement; again, she rejected this offer.[4] The college then returned to the State Board and at the May meeting informed the Board that it had "exhausted every resource of power at the present time short of condemnation." The Board was also informed that the legislature had appropriated funds for the college which would necessitate relocating certain programs and thus increased the college's need for additional

---

[3]Mrs. Hutch emphasizes a comment made by Dr. Story during the meeting. While discussing the proposed resolution, Dr. Story stated that he preferred a resolution which gave the college authority to condemn for fee title as opposed to a resolution limited to condemning for a light easement, as a broader resolution would give the college "additional leverage."

[4]The college apparently also made an offer to purchase Mrs. Hutch's home; this offer was also rejected.

property.[5] The Board then unanimously approved, with little discussion, a resolution authorizing the college to commence condemnation proceedings against Mrs. Hutch's property.[6]

In early June 1979, the State, acting on behalf of the college, instituted condemnation proceedings in Cowlitz County Superior Court. In September the Superior Court held a 2–day hearing on the State's petition for an order adjudicating public use and necessity, the first phase of any condemnation proceeding. Counsel for Mrs. Hutch attempted throughout the course of the hearing to raise the issue of the college's failure to comply with the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, and local zoning ordinances in its installation of the lighting system. At the conclusion of the hearing the Superior Court held that the State Board had acted arbitrarily and capriciously by failing to consider at its May meeting the alternative of condemning only for a light easement. Based on this finding the court refused to permit condemnation of the fee and entered an order of public use and necessity limited to a light easement. The Superior Court also held that SEPA and local zoning ordinances could not be raised as defenses in a condemnation proceeding. Both the State and Mrs. Hutch appeal.

On appeal we are faced with two issues: (1) whether the Superior Court erred in concluding that the State Board acted arbitrarily and capriciously in failing to consider the alternative of condemning for a light easement; and (2) whether SEPA and/or zoning ordinances may be raised as defenses in a condemnation proceeding. With reluctance,

---

[5]The State in its brief also notes that between the October and May meetings the college obtained a $30,000 grant from the City of Longview to help establish a permanent home for the Headstart Program that the college intended to place on the Hutch property. Our review of the record, however, indicates that this grant was not brought to the State Board's attention at the May meeting.

[6]Because it lacked the necessary funds to purchase the property, the college abandoned its attempt to condemn a parcel of property adjacent to Mrs. Hutch's property.

we reverse on the first issue. With less reluctance we affirm on the second issue.

█ Regarding the first issue, the law is clear that before an order of public use and necessity can be entered, the following elements must be established: (1) that the proposed use of the property is a public use; (2) the public interest requires the public use; and (3) the property appropriated is necessary for the proposed use. *State v. Brannan*, 85 Wn.2d 64, 530 P.2d 322 (1975). Neither party disputes the Superior Court's conclusions that the first two elements have been met. As to the third element, which presents a legislative question, the State Board's resolution of May 23 is deemed conclusive absent proof of actual fraud or arbitrary or capricious conduct. *Port of Olympia v. Deschutes Animal Clinic, Inc.*, 19 Wn. App. 317, 576 P.2d 899 (1978). The State's quarrel is with the Superior Court's conclusion that the State Board did act arbitrarily and capriciously.

█ In *Tacoma v. Welcker*, 65 Wn.2d 677, 399 P.2d 330 (1965), the Supreme Court defined "arbitrary and capricious" as

> willful and unreasoning action, without consideration and regard for facts or circumstances. Action, when exercised honestly, fairly, and upon due consideration is not arbitrary and capricious, even though there be room for a difference of opinion upon the course to follow, or a belief by the reviewing authority that an erroneous conclusion has been reached.

(Citations omitted.) *Welcker*, 65 Wn.2d at 684–85. Further, because the determination of whether certain conduct is arbitrary and capricious involves an interpretation of the legal significance of evidentiary facts, the Superior Court correctly characterized its holding as a conclusion of law. *See Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 21 Wn. App. 194, 197 n.5, 584 P.2d 968 (1978). Consequently, we are in no way bound by the Superior Court's conclusions. *See Local 1296, Int'l Ass'n of Firefighters v. Kennewick*, 86 Wn.2d 156, 542 P.2d 1252 (1975).

With these principles in mind we believe the Superior Court erroneously concluded that the State Board's failure, at its May meeting, to consider the alternative of condemning only for a light easement constituted arbitrary and capricious conduct. In reaching its conclusion and issuing an order of public use and necessity limited to condemning a light easement, the Superior Court in effect ruled that the State Board acted arbitrarily and capriciously by failing to limit its exercise of its power of eminent domain to obtaining a light easement. Although it made specific findings the Board did not act fraudulently or in bad faith, it is apparent the Superior Court believed that the primary motivation for the college's condemnation request was to settle the dispute over the lighting system and thus the college needed only a light easement. We believe, however, that the effect of the Superior Court's ruling is to place too much emphasis on the apparent motives of the college and too little on whether the requisite showing of reasonable necessity had been established.

The extent to which a condemnor's motive is relevant to a determination of public use and necessity is unclear under Washington case law. In *State ex rel. Tacoma School Dist. 10 v. Stojack,* 53 Wn.2d 55, 330 P.2d 567, 71 A.L.R.2d 1064 (1958), the Supreme Court held:

> Generally, the action of a public agency or a municipal corporation having the right of eminent domain in selecting land for a public use will not be controlled by the courts, except for a manifest abuse of discretion, violation of law, fraud, *improper motives,* or collusion.

(Italics ours.) *Stojack,* 53 Wn.2d at 64. Eight years later, however, the Supreme Court held that "[t]he impelling motives involved in the condemnation of property . . . are not . . . material." *Apostle v. Seattle,* 70 Wn.2d 59, 62, 422 P.2d 289 (1966). *But see Deaconess Hosp. v. State Highway Comm'n,* 66 Wn.2d 378, 405, 403 P.2d 54 (1965), where Justice Hale lists among the tests to be used for gauging administrative decisions, *inter alia,* the following:

> Were the agency's motives honest and intended to bene-

fit the public? Were they honestly arrived at—that is, free from influence of fraud and deceit? Were they free of any purpose to oppress or injure—even though injury and damage to some may be inherent in accomplishing the particular public benefit?

■■ Regardless, however, of whether motive is at all relevant to condemnation proceedings, we believe that the underlying motive of a condemnor is of limited utility in determining whether the condemnor has acted arbitrarily and capriciously. This case offers a good example of why we believe this to be true. We, like the Superior Court, are convinced that a primary motive behind the college's asking for condemnation authority *when it did* was to resolve its dispute with Mrs. Hutch. To this extent it can be said the college's motive was improper. In essence, the college viewed the power of eminent domain as a means of pressuring Mrs. Hutch into capitulating. At the same time, however, we are convinced that the college presented to the State Board the requisite showing of need for Mrs. Hutch's property. See discussion, *supra*. The record is much less clear as to the motives of the members of the State Board who had the ultimate authority to determine if the college's request should be granted.[7] Thus, in the context of this

---

[7]The record, as reflected in the resolution passed at the October meeting, indicates that members of the State Board were very sensitive to the concerns of Mrs. Hutch. At the same time, however, the record indicates that the members believed the college had demonstrated need, as indicated by the following testimony of Louis Soriano:

Q Did you have an opinion regarding whether or not Lower Columbia College had demonstrated a need for the property as of October 18th or as of the time of this meeting that you have been testifying about?

A Yes.

Q What was that opinion?

A That he had demonstrated a need.

Q Did the need require the taking of the entire ownership of Mrs. Hutch's property or merely a portion of it?

A The entire property.

Q In your opinion, as Chairman of the State Board for Community College Education, as of May 23rd, 1979, had Lower Columbia College demonstrated a need for the entire ownership of the subject property?

A Prior to what date?

case any attempt to focus on the motives underlying a condemnation request presents the dilemma of deciding whose motive is determinative.

We believe the proper analysis in determining whether a condemnor has acted arbitrarily and capriciously should focus on the "facts and circumstances" of the condemnor's request. *Welcker*, 65 Wn.2d at 684. Although motivated in part by improper considerations, if examination of the facts and circumstances of the proposed condemnation demonstrates a genuine need and if in fact the condemnor intends to use the property for its avowed purpose, the condemnor's action cannot be arbitrary and capricious. *See, e.g., In re Hewlett Bay Park*, 27 A.D.2d 578, 276 N.Y.S.2d 312 (1966), *mem.* Under this standard we believe the State Board's action in authorizing condemnation of fee title to Mrs. Hutch's property was not arbitrary and capricious.

Q I am sorry. This is as of May 23rd, 1979.

A Yes.

At another place in the record, when asked why he proposed the amendment to the resolution, see *supra*, page 33, Mr. Soriano gave the following answer:

Q For what purpose did you propose the amendment?

A It was the intent of myself, after hearing testimony and being concerned with the human element, Mrs. Hutch, and recognizing at the same time that ultimately the property of Mrs. Hutch, in my opinion, would be acquired by Lower Columbia, that if there was a way of reaching an agreement between the two parties on a temporary basis, whether it be six months, a year, three years, four years, so she can reside there until the ultimate would come about, that that would be an all-out position and that amendment was made on the basis of concern for Mrs. Hutch, recognizing that the ultimate would come about after hearing all the testimony.

Q The resolution as it appeared in its pre-amendment form, did it propose that Lower Columbia College acquire the entire ownership of the property owned by Mrs. Hutch?

. . .

A The resolution, as passed by the Board, was intended to give Lower Columbia the ultimate responsibility of applying that condemnation at any time that they felt it would be necessary. That resolution, if it were passed and it was passed, gave them that authority, and when the State Board passed that resolution along with the amendment, it was felt by this Chairman and this Board member that that would not appear before the State Board again. It was felt that it gave Lower Columbia final authority and only added an amendment hoping that some reasonable effort would be made to accommodate for a period of time, Mrs. Hutch.

Documents prepared by the college staff and staff of the State Board prior to the September meeting indicate that the college's campus was "far too small" for a community college and that the only direction in which the college could expand was in the area in which Mrs. Hutch's property is located. Also, the college had proposed the addition of a major vocational facility that would necessitate the relocation of certain programs and additional space for parking. By the May meeting, funding for this facility was nearer reality. Finally, the college needed a location for its Headstart and Parent Education Programs. While admittedly the college's need for the property was not immediate, such a showing is not a requirement for a public order of use and necessity. *See State v. Culley,* 11 Wn. App. 695, 524 P.2d 437 (1974). *See State ex rel. Tacoma School Dist. 10 v. Stojack, supra; see also* 1 J. Sackman, *Nichols on Eminent Domain* § 4.11 (rev. 3d ed. 1980). Further, nothing in the record suggests that the college will not in fact use the property for the uses it had advocated. Consequently, the State Board reasonably could have believed that the requisite need had been established, thus justifying authorizing condemnation for fee title. *See Chapman v. PUD 1,* 367 F.2d 163 (9th Cir. 1966), where the court said at page 168:

> In these circumstances, reasonable prudence dictated the taking of the fee [as opposed to an easement] in the first instance to avoid the uncertainty, delay, and expense of an early repetition of the long and costly acquisition process.

Although we are extremely sympathetic to Mrs. Hutch's position, we conclude that the State Board did not act arbitrarily and capriciously.

As to the SEPA issue, WAC 197–10–170(9)(a) explicitly exempts the provisions of SEPA from "[t]he purchase or acquisition of any right to real property." *See* WAC 197–10–040(32). Mrs. Hutch argues, however, that this provision is inapplicable because the condemnation of property necessarily requires a determination of use and WAC 197–10–

170(9)(a) concerns only the "purchase or acquisition" of property. Thus, contends Mrs. Hutch, the use that the property is put to, which in this case Mrs. Hutch assumes is limited only to insuring continuation of the lighting system, is subject to the requirements of SEPA.

■ We find this argument unpersuasive. Our reading of the explicit language of WAC 197–10–170(9)(a) leaves no room for the purported distinction, which strikes us as one of semantics. Further, even if the distinction is valid, the uses for which Mrs. Hutch's property is to be acquired, as discussed above, range far beyond the continued operation of the lights. At this point in time, questions of SEPA compliance for the proposed uses of the property would be purely speculative. *See Marino Property Co. v. Port of Seattle,* 88 Wn.2d 822, 567 P.2d 1125 (1977); *Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978). Also Mrs. Hutch's attempt in this proceeding to litigate the college's failure to comply with SEPA in installing the lights is essentially a collateral attack of the type prohibited in *State v. Brannan,* 85 Wn.2d 64, 530 P.2d 322 (1975). Mrs. Hutch's lawsuit against the college would have provided the appropriate forum in which to contest this issue.[8]

It should be clearly understood, of course, that even though condemnation of the fee appears to moot the SEPA issue, nothing in this opinion is intended to affect Mrs. Hutch's right to any damages to which she may be entitled, because of the initial lighting installation.

■ Lastly, we do not believe that local zoning ordinances may be raised as a defense. The issue is closely analogous to the situation before this court in *South Hill Sewer Dist. v. Pierce County,* 22 Wn. App. 738, 591 P.2d

---

[8]Mrs. Hutch also cites in support of her argument, federal cases which have allowed the issue of compliance with the National Environmental Policy Act, 42 U.S.C.A. §§ 4321 *et seq.,* in a condemnation proceeding. *See, e.g., United States v. 18.2 Acres of Land,* 442 F. Supp. 800 (E.D. Cal. 1977). Because, however, of the WAC provision and the pertinent Washington case law, these cases are inapposite. Further, we note the federal cases are not unanimous on this issue. *See United States v. 255.25 Acres of Land,* 553 F.2d 571 (8th Cir. 1977).

877 (1979), in which we held a county's zoning regulations could not be invoked to prohibit a sewer district's exercise of eminent domain in selecting a site for a sewerage disposal facility given the broad grant of power contained in the statute granting sewer districts the power of eminent domain. Because the grant of power to the State Board is equally broad, *see* RCW 28B.50, our holding in *South Hill* dictates a similar result here.[9]

Judgment reversed and remanded with direction to enter an order of public use and necessity for fee title.

PETRIE, J., and JOHNSON, J. Pro Tem., concur.

Reconsideration denied August 31, 1981.

Review denied by Supreme Court October 30, 1981.

---

[9]Mrs. Hutch's reliance on *Edmonds School Dist. 15 v. Mountlake Terrace,* 77 Wn.2d 609, 465 P.2d 177 (1970), is misplaced as that case involved a dispute between two entities deriving authority from the State, as opposed to a dispute between the State itself and a subordinate political subdivision. *See State v. Seattle,* 94 Wn.2d 162, 615 P.2d 461 (1980).