[No. 34986. *En Banc.* March 19, 1959.]

THE PORT OF TACOMA, *Respondent*, v. THE TAXPAYERS OF THE PORT OF TACOMA, *Appellants.*[1]

[1] Reported in 336 P. (2d) 872.

*Howard Carothers* and *Thomas A. Swayze, Jr.,* for appellants.

*John H. Binns,* for respondent.

DONWORTH, J.—This action was instituted by the Port of Tacoma against the taxpayers of the port district, under the provisions of RCW 7.24.010 *et seq.,* and RCW 7.25.010 *et seq.,* for the purpose of testing and determining the validity of an issue of general obligation bonds in the amount of $5,400,000 described in its resolution No. 1573, adopted by its commissioners April 16, 1958.

The complaint alleged the various steps taken prior to the adoption of resolution No. 1573 preliminary to the issuance of the bonds, including (1) the adoption of resolution No. 1435 declaring the intention of the port commission to adopt an amendment to its comprehensive scheme of harbor improvement; (2) the adoption of resolution No. 1438 (after holding a public hearing pursuant to published notice as required by law) effecting such amendment to its comprehensive scheme; (3) the prior acquisition of substantially all real property referred to in section 1A of the resolution; (4) the adoption of resolution No. 1439 providing for the calling of a special bond election on November 6, 1956, for the purpose of submitting to the qualified voters a proposition for the issuance of the bonds; (5) the holding of the special election at which more than sixty per cent of the votes cast were in favor of the issuance of the bonds (the total votes cast exceeding fifty per cent of the total number cast at the next preceding general election).

The complaint further alleged that the total indebtedness of the port district, including this issue of bonds, was less than three per cent of the total assessed value of the taxable property therein.

The concluding paragraph of the complaint and the prayer for relief were as follows:

"It is the purpose and intent of Plaintiff to issue and sell bonds as stated in said Resolution No. 1573 and to use the proceeds for all of the purposes therein set forth and to pay the principal and interest on the same by a levy of taxes,

which levy will, if deemed necessary or advisable by the Port Commission, be a levy in excess of statutory limitation. It is desired that Plaintiff's right so to issue and sell the bonds and to pay principal and interest thereon out of such levy or levies be tested and determined in this action.

"WHEREFORE, Plaintiff prays:

"1. That the Court test, declare and determine the right of the Plaintiff in this action to issue and sell bonds, as stated herein, as is its purpose and intention, and to pay the principal and interest on the same by a levy in excess of statutory limitations;

"2. That the Court adjudicate and decree the Plaintiff's right to issue and sell the said bonds, as stated herein, and to pay the principal and interest on the same by a levy in excess of statutory limitations, and that it enter an order directing as affirmative relief, that the Plaintiff issue, sell, and pay the principal and interest of said bonds as prayed for herein."

A supplemental complaint was subsequently filed in which it was alleged:

"I. When the Port Commission of the plaintiff, the Port of Tacoma, passed Resolution No. 1573, copy of which is attached to the complaint herein as Exhibit 'G,' it was the intention of the Port Commission that the monies received from the sale of bonds therein authorized to be sold should be used only for purposes other than the acquisition of land, but by inadvertence certain language was included in Section 6 thereof which may be construed to authorize the use of such monies for land acquisition.

"II. This matter having been called to the attention of the said Port Commission it did, on July 9, 1958, at a regularly scheduled meeting thereof, pass Resolution No. 1581, copy of which is hereto attached, marked Exhibit 'H' and fully incorporated herein by reference.

"III. It is the intention of the Port Commission, and it deems itself bound, to spend the monies received from the sale of said bonds for the purposes set forth in said Resolution No. 1573 (Exhibit 'G') as modified by said Resolution No. 1581 (Exhibit 'H') and for no other purpose, and that none of said monies shall be used to pay for any land heretofore or hereafter acquired by the Port of Tacoma.

"WHEREFORE, Plaintiff prays that it be granted judgment and relief as prayed for in its Complaint herein."

The taxpayers' demurrer to the complaint and supple-

mental complaint having been overruled, they (appellants) answered, admitting all the allegations of the original complaint except that they denied on information and belief that "substantially all the real property lying within the Port of Tacoma Industrial Development District has been acquired by plaintiff as stated in said sentence." In answer to the supplemental complaint, the taxpayers admitted the adoption of resolution No. 1581 but denied the remaining allegations thereof.

Appellants' answer contained an affirmative defense in which it was asserted that the principal purpose of the bond issue was to provide funds for the acquisition and improvement of lands within the Port of Tacoma industrial development district pursuant to the provisions of Laws of 1955, chapter 73, p 429 (RCW 53.25.010 *et seq.*), and that this statute violated certain provisions of the state and Federal constitutions and was, therefore, invalid.

The port's reply denied that the proceeds of the sale of the bonds was to be used to acquire land, and alleged that the principal purposes of the bond issue "were and are the improvement of the harbor and terminal facilities of the Port of Tacoma and the dredging of waterways in furtherance thereof." It was further alleged:

". . . that all of the lands within said District upon which bond monies will be expended, are lands which are necessary either for the physical sites of the contemplated waterways or for the disposal of the material necessarily dredged from said waterways. Plaintiff admits that an incidental result of said operations will be to improve certain lands within the Port of Tacoma Industrial Development District; that some of the lands which will thus be incidentally improved were acquired by plaintiff under and pursuant to the Industrial Development Act; that it is contemplated that eventually some of said lands may be sold to private parties in accordance with law; that the general laws governing Port Districts authorize each and every one of said contemplated acts and uses of the proceeds of said bond issue without any necessity for reference to the Industrial Development District Act."

Upon the rather narrow issues thus framed, the case came on for trial. The port introduced two witnesses.

The first witness was its chief engineer, who identified and explained a map of the district which showed the proposed extension of the port industrial and Hylebos waterways. He testified that an area one thousand feet on each side of each waterway was to be used to deposit material dredged up or excavated in the extension of these waterways. The total acreage situated within the one-thousand-foot strips was 693. Of this land, 109.4 acres were owned by private industries, 45½ acres were in the process of acquisition by the port, and the remainder had already been acquired by the port at an estimated cost of $772,200.

The port's other witness was one of its commissioners, who testified that, at the time of the adoption of resolution No. 1573, on April 16, 1958, the port had already acquired or arranged for the acquisition of all land within the one-thousand-foot strips without reference to the bond issue, and that it was the intention of the port commissioners to complete the acquisition of the remainder of the land without using any bond proceeds. He said that the language of section 6 of resolution No. 1573 was inadvertently included and, upon the matter being called to their attention, the commissioners passed resolution No. 1581. He further testified, on direct examination, as follows:

"Q. And specifically, do all of the members of the Port Commission consider themselves bound by the terms of the revised Resolution, and that it would be a breach of faith and a breach of trust to use any of this bond money for the acquisition of any land? A. As evidenced by the latter of the two Resolutions. The purpose and intention and obligation of the Port is to acquire the land without the use of any bond money. Q. And what are the purposes, and the only purposes now, for which the Port Commission intends to use these funds, Mr. Blair? A. Well, the purpose in part is to make certain improvements on the waterway, that is by way of completing the fill and completing the quay dock, and providing wharves, piers, and transit sheds and other facilities for adapting the area on Sitcum waterway, which is north of 11th Street, for terminal purposes generally. It proposes to use an additional portion of the funds to extend the Hylebos waterway and improve the area around Hylebos waterway for industrial and waterway

uses. The remaining balance of the fund is proposed to use to extend the Port Industrial waterway, as shown on the. map that is in evidence, and to improve the area surrounding that waterway for industrial and waterway uses. Q. Is this a fair statement, Mr. Blair, and I quote from the Paragraph Two of our Reply: 'That all of the lands within said District, upon which bond monies will be expended, are lands which are necessary either for the physical sites of the. contemplated waterways or for the disposal of the material necessarily dredged from said waterways'? Is that a fair statement? A. That is correct."

On cross-examination, the commissioner testified that, at the time resolution No. 1439 was adopted, in 1956, the commission was under the impression that the port might not have enough money to acquire all the land without resorting to bond proceeds, but it subsequently developed that the port did have sufficient other funds with which to acquire the land. Counsel for the port admitted that in various condemnation proceedings had since 1955 to acquire land, such land had been classified as "marginal land" as well as land required for port development purposes. This resulted in the following stipulation:

"THE COURT: Let the record show, then, that it is stipu-. lated between the parties that the judgments acquiring these lands by condemnation for the Port in prior litigation are supported by affirmative findings of fact that the lands are necessary and convenient for the use of the Port, and also that such lands so acquired by condemnation were marginal lands as described and defined in the [1955] Port Industrial Development Act."

The taxpayers offered no evidence and, after hearing the' arguments of counsel, the trial court announced its decision in favor of the port.

Thereafter, findings of fact, conclusions of law, and judg-. ment were entered. The judgment declared that the port had complied with all the requirements of law relating to¦ the issuance of general obligation bonds in the amount of $5,400,000, and that it had full right to issue and sell the., bonds as authorized by the qualified voters on November 6, 1956, and to pay the principal and interest thereon and make.,

special levies of taxes therefor when deemed necessary or advisable.

The taxpayers have appealed from this judgment and have assigned as error the making of part of finding No. 13 and the entry of conclusions of law Nos. 3, 4, and 5. We shall consider these assignments in the order in which they are discussed in the taxpayers' brief.

For convenience, we shall refer to appellants as "the taxpayers" and to respondent as "the port."

The taxpayers first assign error to the trial court's making finding of fact No. 13, as follows:

"When the Port Commission of the plaintiff, the Port of Tacoma, passed said Resolution No. 1573, it was as the intention of the Port Commission that the monies received from the sale of bonds therein authorized to be sold should be used only for purposes other than the acquisition of land, but by inadvertence certain language was included in Section 6 thereof which might be construed to authorize the use of such monies for land acquisition.

"This matter having been called to the attention of the said Port Commission it did, on July 9, 1958, at a regularly scheduled meeting thereof, pass Resolution No. 1581, copy of which is attached to the Supplemental Complaint herein, marked Exhibit 'H' and fully incorporated herein by reference.

"It is the intention of the Port Commission of the Port of Tacoma and it deems itself bound, to spend the monies received from the sale of said bonds for the purposes set forth in said Resolution No. 1573 (Exhibit 'G') as modified by said Resolution No. 1581 (Exhibit 'H') and for no other purpose, and that none of said monies shall be used to pay for any land heretofore or hereafter acquired by the Port of Tacoma.

"It is the purpose of Plaintiff to spend the money provided by the sale of the general obligation bond issue so authorized by the qualified voters for all of the purposes set forth in said Resolution No. 1573 as modified by said Resolution No. 1581."

Likewise, error is assigned to conclusion of law No. 3, which states:

"Defendants are not entitled to any relief because the purposes for which the proceeds of the bond issue here in ques-

tion are to be used are defined in Resolution No. 1573, as modified by Resolution No. 1581, of the Port of Tacoma, and are within the powers of plaintiff under the general laws governing Port Districts, without reference to the Industrial Development District Act, Chapter 73, Laws of Washington, 1955."

The taxpayers argue that since resolutions Nos. 1573 and 1581 were adopted subsequent to the election, they could have no bearing on the precise issue of whether or not, at the time of the election, the port was proceeding under the authority of Laws of 1955, chapter 73 (RCW 53.25.010 *et seq.*), relating to the establishment of industrial development districts. Thus, it is argued, in so far as they are necessary in deciding this question, those purposes set forth in resolution No. 1439 are controlling. However, the taxpayers apparently concede in the brief that:

"Therefore, we shall not discuss the question of the right of the port commission, in adopting these resolutions to digress from the purposes specified in Resolution 1439 by omitting acquisition of lands as a purpose since this question is not material to the issues here involved. In view of the fact that only a part and not the entire cost of the improvement was to be paid out of bond moneys, we assume that the port commission in adopting Resolution 1573 could within reason digress from the purposes specified in Resolution 1439 so long as the purposes were not expanded."

The taxpayers then point out that since Part A of resolution No. 1439 authorized the port to expend bond proceeds for the acquisition of land located within the industrial development district, that fact brings this bond issue within the ambit of the 1955 act.

The taxpayers continue their argument by calling attention to the fact that the port established an industrial development district under the authority first granted by Laws of 1939, chapter 45, p. 130. Under the 1939 act, the power of eminent domain relative to the acquisition of property necessary for industrial development district purposes was expressly limited to land which had not been improved by the owner or his predecessors to the extent of $25,000 or more. No reference to marginal lands was made in that

statute. Laws of 1955, chapter 73, which repealed the 1939 act, eliminated the limitations on the power of eminent domain imposed by the 1939 act and created the category of "marginal lands," the power of eminent domain with respect to such lands being granted in section 19 thereof.

The taxpayers then refer to the trial court stipulation, previously set out in this opinion, to the effect that all lands acquired by condemnation since 1955 had been acquired both as marginal lands and as lands necessary and convenient for the use of the port. It is then asserted that, when a port district establishes an industrial development district, and then appropriates and develops land within such district, its actions are governed by the provisions of Laws of 1955, chapter 73. The taxpayers contend that these facts show that the port was proceeding under Laws of 1955, chapter 73, at the time the bond issue was submitted for the approval of the people.

■ Whether the port, having first established the industrial development district prior to 1955, thereafter acquired, by condemnation, certain lands within the industrial development district as marginal lands, is immaterial to this proceeding. The bond monies here in question were not and are not involved. The conclusion urged upon us by the taxpayers necessarily assumes that bond proceeds are going to be used for the acquisition of land. As previously pointed out, this is not in accord with the facts as found by the trial court on undisputed evidence. The bond proceeds in this case are to be used solely for the dredging of waterways, the filling of low-lying lands to the extent necessary to dispose of the material dredged from the waterways, and for extending, constructing, and improving roads, constructing incidental water, power, rail and drainage facilities, a wharf, loading ramps, staging areas, and constructing and equipping a transit shed. Port districts have had authority to devote public funds for these purposes ever since their creation was first authorized by statute in 1911. See Laws of 1911, chapter 92, p. 412 [cf. RCW 53.08.020, 53.08.060, 53.36.030].

In what seems to be a final effort to bring the bond issue within the provisions of Laws of 1955, chapter 73, the taxpayers rely upon the testimony of one of the port commissioners, who was a witness for the port, to the effect that the whole development was designed to improve the property within the district for "industrial purposes," and primarily those connected with the operation of necessary waterways leading to ocean commerce. In construing the word "industrial," the taxpayers take it out of context as used by the witness and attempt to interpret it as meaning industrial *development district* purposes. In the context in which the word was used by the witness, it can only reasonably be construed to mean those purposes necessary for the use of the port in connection with the amendment to its comprehensive scheme of harbor improvement.

■ Since it is clear that the question of land acquisition is not before us, and that those purposes for which the bond proceeds are actually going to be used were authorized by the statutes relating to the powers of port districts as they existed prior to the enactment of Laws of 1955, chapter 73, the taxpayers have no standing to raise any question as to the constitutionality of that act, since they are not affected thereby. It has long been the settled policy of this court to decide only those questions necessary to the decision of the particular case, and, thus, one cannot invoke a constitutional objection to a statute not applicable to his own case. *State v. Canyon Lbr. Corp.*, 46 Wn. (2d) 701, 284 P. (2d) 316 (1955); *State ex rel. Campbell v. Case*, 182 Wash. 334, 47 P. (2d) 24 (1935); *Ajax v. Gregory*, 177 Wash. 465, 32 P. (2d) 560 (1934); *State v. Bowen & Co.*, 86 Wash. 23, 149 Pac. 330 (1915), and cases cited therein.

■ If this court were to pass upon the constitutionality of Laws of 1955, chapter 73, under the facts of this case, it would be rendering an advisory opinion, which we have repeatedly refused to do. *Kitsap County v. Bremerton*, 46 Wn. (2d) 362, 281 P. (2d) 841 (1955); *Conaway v. Time Oil Co.*, 34 Wn. (2d) 884, 210 P. (2d) 1012 (1949), and cases cited.

For these reasons, we do not consider the taxpayers' third assignment of error relative to the trial court's conclusion of law that Laws of 1955, chapter 73, is constitutional. The taxpayers' remaining assignments are without merit for the reasons hereinabove stated.

The judgment appealed from is hereby affirmed.

ALL CONCUR.