[No. 35654. Department One. February 2, 1961.]

THE STATE OF WASHINGTON, on the Relation of Wenatchee-Beebe Orchard Company, Relator, v. THE SUPERIOR COURT FOR CHELAN COUNTY, Lawrence Leahy, Judge, Respondent.[1]

*Pebbles & Swanson*, for relator.

*The Attorney General, Edward E. Level* and *John C. O'Rourke, Assistants*, for respondent.

DONWORTH, J.—This matter is before us pursuant to a write of certiorari, issued by the chief justice upon the application of the relator, to review an order entered by the Superior Court of Chelan County adjudicating that

[1]Reported in 359 P. (2d) 146.

the use for which the state of Washington seeks to acquire, by condemnation, a certain portion of relator's land is a public use.

In order to understand the problem involved, it is necessary to describe the geographical location of relator's property in some detail.

The state proposes to improve secondary state highway No. 10D by the construction of a bridge across the Columbia River near Chelan station. The legislature has authorized this highway to provide a connection between primary state highway No. 2 (near Orondo), which is on the east side of the river, and primary state highway No. 10 which is on the west side. The connection between No. 10D and No. 10, according to the legislative plan, is ultimately to be made at or near Azwell.

The relator, a Delaware corporation, owns land on each side of the river near the location of the proposed state bridge. It owns a private bridge (called the Beebe Bridge) which crosses the river just south of the location of the new state bridge.

We are concerned in this case only with that part of the relator's property located on the west bank of the river where relator is operating a large apple orchard. At this point, the state seeks to condemn 4.33 acres for the western approach to the bridge. This approach fans out in two directions as one proceeds westerly from the bridge. One "leg" follows the left center line of the proposed roadway marked "temporary connection," which leads traffic into Chelan station; the other "leg" follows the center line marked "ultimate alignment," and branches off to the right from the left center line, and proceeds about one thousand feet to a point on the map marked "End of Project." It is the condemnation of this latter "leg" which is challenged in this proceeding.

The relator in its brief, after setting forth four assignments of error, states the problem before us as follows:

"The sole and only question for review by this court then is—whether or not the area of Relator's lands shown

on Exhibit 1 as 'ultimate alignment' may be now taken for public use under the record and facts in this case?"

Relator's contention is that there can be no taking of its land within the ultimate alignment boundaries because the location of the highway between that point and Azwell (located on highway No. 10) has not yet been determined by the highway commission or the director of highways. It is further argued that no showing has been made that the state will use this specific parcel for highway purposes within a reasonable time. For these reasons, the actions of the highway commission and the director in condemning it are claimed to be arbitrary, capricious, and constructively fraudulent. The state, on the other hand, contends that relator's land sought to be taken in this proceeding is presently necessary for public use.

The only witness who testified at the hearing as an expert regarding the necessity for acquiring the ultimate alignment leg of the project was James Parkhill, resident engineer for the highway department in the Wenatchee area. His district included Chelan station and all adjacent territory which is involved in this proceeding. Each party refers to different portions of his testimony which each claims support its own position in the controversy.

Before considering the resident engineer's testimony, it is well to have in mind certain statutory provisions which are pertinent to this case.

RCW 47.20.400 (as last amended by Laws of 1959, chapter 319, § 18, p. 1530) describes the route of this secondary state highway (No. 10D) as follows:

" . . .

"Secondary state highway No. 10D; beginning at a wye junction with primary state highway No. 10 in the vicinity east of Chelan, thence in a southerly direction crossing the Columbia river in the vicinity of Chelan Station to a junction with primary state highway No. 2 in the vicinity of Orondo; also beginning at a junction with primary state highway No. 10 in the vicinity south of Azwell, thence southerly to a junction with secondary state highway No. 10D in the vicinity of Chelan Station."

The latitude granted by the legislature to the director of highways in making a definite location of an authorized highway is stated in RCW 47.28.010 in the following language:

"Whenever the general route of a state highway is designated as running to or by way of certain designated points, without specifying the particular route to be followed, the director shall determine the most feasible route to be followed by the highway to or by way of the designated points, and may select and adopt as a part of the highway, the whole or any part of any existing public highway previously designated as a county road, primary road, or secondary road or at any time classified as a county road. The director need not select and adopt the entire routes for the state highways at one time, but may select parts of the routes from time to time as he deems advisable. When a state highway is designated as passing by way of a certain point, this shall not require the director to cause the highway to pass through or touch such point but such designation is directional only and may be complied with by location in the general vicinity. The director may construct as a part of a state highway as designated and in addition to any portion meeting the limits of a city or town, a bypass section either through or around the city or town."

By RCW 47.12.010, the director is empowered to acquire, by condemnation, any property and property rights necessary for the construction, protection, and maintenance of state highways. This section includes the following provision:

". . . Condemnation actions shall be brought in the name of the state as provided for acquiring property for the public uses of the state, and in such actions selection of the property and property rights by the director is conclusive that they are necessary for the purposes sought, in the absence of bad faith, or arbitrary, capricious, or fraudulent action. . . ."

The decision in this case depends on an evaluation of the testimony of the state's engineer, Mr. Parkhill, viewed in the light of the above-quoted statutory provisions. There is no conflict in testimony here because there was no other witness who testified on the pivotal issue. (Relator's only witness testified as to the nature of the land taken and the pres-

ent use to which it was being put.) There are no formal findings of fact separate from the recitals in the court's order of public use.

Under these circumstances, portions of Mr. Parkhill's testimony regarding the prospect of the state's locating and constructing a highway between the end of the ultimate alignment leg (near Chelan station) and Azwell (which is on primary state highway No. 10) must be set forth. While the distance between these two points does not appear in the record, we can take judicial notice of the fact that they are about fifteen miles apart.

On cross-examination, Mr. Parkhill testified:

"Q. Now, as I understand it, there has been no location work done from the vicinity south of Azwell to the vicinity of Chelan Station at the present time? A. Yes, there has been. Q. And there has been no location decided upon for that highway? A. We have two tentative routes. Q. You have two tentative routes? A. That is correct. Q. Could there be a third? A. There could be any number. I imagine they would all be within the same corridor, however. Q. It is true you are still in the process of locating it, though, is it not? A. That is correct. Q. And what you do with respect to that road will depend more or less upon the effect of Rocky Reach Dam and the Wells Dam, to some extent? A. That is correct, yes. Q. So that you cannot complete your location until after the completion of those two dams and after the water is up to the level contemplated as the constant pool? A. Oh, yes, we can complete our locations prior to that. We know the location and height of the water behind the Rocky Reach pool. However, there might be some lapse in time due to the Wells project. Q. Yes, there would be a lapse of time? A. In the vicinity of Azwell, above and north of Azwell. Q. And what about south of Azwell—any effect on it by the Wells Dam? A. Very little."

His testimony on redirect examination included the following:

"Q. Now, Mr. Parkhill, Mr. Pebbles directed your attention to RCW 40.72.400, which is taken in part from the 1959 session laws. Now, as you testified, Mr. Parkhill, the limits of one of the legs of 10-D is the vicinity south of Azwell— in other words, Azwell south. Now will the construction of

the facilities to which you referred, Rocky Reach Dam and Wells Dam, affect the 10-D project south of Azwell, which is the project we are concerned with? A. Not appreciably in the vicinity of Azwell. There is a possibility that had this access been built—this is merely an assumption—that it might have had to be changed by the construction of Rocky Reach Dam and the completion of Rocky Reach. However, it is not going to affect our location as of now. Q. Would you state then whether or not the general route of 10-D has been located? A. Yes, it has. Q. I am not speaking, Mr. Parkhill, with relation to Legislative declaration—I am indicating it has been located by the Department. A. That is correct. Q. Now, in any event, would the location of 10-D which calls for the right-of-way as shown on the maps, insofar as the Beebe property is concerned, be affected by the pendency of the various improvements concerning which Mr. Pebbles questioned you? A. I don't believe so. It is my opinion they wouldn't be."

█ The effect of this testimony, as we read it, is that the precise route of the highway to be constructed between the end of the ultimate alignment leg and Azwell would be necessarily within a "corridor" between the westerly limits on the Rocky Reach pool and the high ground rising to the west thereof. For reasons stated below, we do not regard the location of this road as material; only the termini are important. Two tentative routes have been considered by the highway department, but they are both in the same general area. It appears, from the only testimony in the case on the subject of the location of a road between the proposed state bridge and Azwell, that, because of the physical character of the terrain, whatever route is ultimately selected will connect with the right or ultimate alignment leg of the project. In short, we think that the state has shown a reasonable necessity for the acquisition of the portion of relator's property involved in this proceeding.

Relator urges the further contention that the court's order adjudicating a public use was erroneously made because there is no showing that the state will use this property for highway purposes within a reasonable time. Reference is made to Mr. Parkhill's testimony that the state probably

will not use the property before 1964, and possibly not until sometime during the succeeding six years.

Appellant cites three of our former decisions as holding that in condemnation cases the condemnor must show that there is a reasonable necessity for public use of the condemned property within a reasonable time. *Spokane v. Merriam*, 80 Wash. 222, 141 Pac. 358 (1914); *Port of Everett v. Everett Improvement Co.*, 124 Wash. 486, 214 Pac. 1064 (1923); and *State ex rel. Hunter v. Superior Court*, 34 Wn. (2d) 214, 208 P. (2d) 866 (1949).

■ Both parties refer to our recent decision in *State ex rel. Sternoff v. Superior Court*, 52 Wn. (2d) 282, 325 P. (2d) 300 (1958), which involved the condemnation of land for a part of the Tacoma-Seattle-Everett freeway. In that case, we recognized that, under RCW 8.20.070, which requires that the trial court determine, in a condemnation proceeding, whether the contemplated use for which property is sought to be acquired is a public use, three prerequisites to such determination are: (1) That the contemplated use be really a public use, (2) that the public interest requires the taking of the property, and (3) that the property sought to be taken is necessary for the purpose for which it is to be used.

In our opinion, these three prerequisites have been complied with in this case. There is no doubt that the taking of the land designated as the ultimate alignment is for state highway purposes, and hence for a really public use. The legislature has established a secondary state highway as a branch of primary state highway No. 10 running from Azwell to a junction with No. 10-D at Chelan station (see RCW 47.20.400). The director of highways has located this junction on the relator's property where the ultimate alignment is shown on the map.

It seems to us immaterial that this branch highway between relator's property and Azwell has not yet been physically located on the ground. As mentioned above, Mr. Parkhill testified that the department was considering two tentative routes. Since the legislature has definitely fixed the two termini of this branch highway, relator is not con-

cerned with the route which it follows between those points. In the second place, the state's witness testified without contradiction that, whatever route should be selected, it would necessarily, because of topographical conditions, have to be within the corridor between the Rocky Reach pool and the high ground to the west.

█ Relator's contention that the director has acted arbitrarily, capriciously, and in a constructively fraudulent manner in taking this land now and not constructing the branch highway until a later date (probably not before 1964 or later), we think is without merit. The testimony of Mr. Parkhill was that the department's programming for No. 10D calls for completion by 1965. We do not consider the state's program unreasonable. Highways, of necessity, must be projected by long-range planning with specific parts of the construction specified for each biennium. There is nothing arbitrary, capricious, or fraudulent about the state's present plans for the construction of the bridge approach along the ultimate alignment.

We appreciate relator's desire to retain possession of its orchard intact for three or four more seasons so that it can raise and market its crop of apples, but the rights of the property owner must be held to be subordinate to the public welfare. Of course, the state must first pay just compensation to relator before it may obtain possession of the property. *State ex rel. Eastvold v. Yelle,* 46 Wn. (2d) 166, 279 P. (2d) 645 (1955). As pointed out in the cited case, if it were not for the restrictions contained in Art. I, § 16 (amendment 9), of the state constitution, the state's power of eminent domain would be absolute.

The trial court was correct in entering its order of public use in this case and its order is hereby affirmed.

MALLERY, WEAVER, OTT, and HUNTER, JJ., concur.

---

June 1, 1961. Petition for rehearing denied.