[No. 5019–II.   Division Two.   January 7, 1982.]

*In the Matter of the Petition of* THE PORT OF GRAYS HARBOR, *Appellant.*

856

*Ernest Ingram, Ingram, Zelasko & Goodwin, Douglas R. Hartwich, Brian E. Lawler,* and *Short & Cressman,* for appellant.

*Robert L. Charette, Paul L. Stritmatter, Curtis M. Jan-hunen,* and *Omar S. Parker,* for respondents.

PEARSON, J.—The Port of Grays Harbor (Port) appeals from an order denying its petition for an order of public use and necessity that would have allowed the Port to condemn 5 parcels of property along the south bank of the Chehalis River as it flows into Grays Harbor. Since the appeal, the Port has acquired 2 of the parcels, 1 from Skarco, Inc., and the other from respondent Jalo. Of the remaining 3 parcels subject to the appeal, 2 are owned by respondents Sell. One of these is a 4–acre parcel which the Sells have developed for use as mobile home sites and as headquarters for their trucking and construction business. The other is a 40–acre tract which contains a large borrow pit from which the Sells obtain landfill materials for use in their construction work. The final site subject to the appeal is owned by respondent Blondo. This property is a small tract immediately adjacent to the 4–acre site of the Sells mentioned above.

### FACTUAL BACKGROUND

For an understanding of the Port's claim of public use and necessity and the issues on appeal, some brief historical facts must be considered. The Port, along with the United States Army Corps of Engineers, has for many years been engaged in a continuous program of dredging the Port's shipping channels of the sediment produced by the Chehalis River where it joins Grays Harbor. Up until the early 1970's, both the Corps and the Port primarily used open water disposal sites in the various reaches of Grays Harbor to dispose of dredge spoils. Ocean dumping was also utilized to disperse this material, as was the deposit of dredge spoils on low–lying intertidal zone sites.

Following the enactment of various environmental legislation, including the establishment of water quality controls, the Port began considering other means of disposing of the spoils. As a result, in 1973 the Port began a landfill of spoils material on the south shore of Grays Harbor. This

landfill differed from previous intertidal dumping sites in that the new water quality standards required diking of these properties so that the dredge spoils from the harbor bottom would not flow over the tideflats. These sites were located on undeveloped, publicly owned and privately held property.

Initially, the Corps assumed the responsibility for constructing the containment dikes, and the Port secured permission from private landowners to put the dredge spoils on their property. The Corps' policy changed in 1978. It then required the Port to construct the dikes as part of the Port's responsibility under the federal navigation project agreement. As a result, the Port determined in 1979 that because of the expense in diking, the Port should own the property used for dredge spoil disposal sites. This prompted an additional decision to condemn the Sells' 40–acre borrow pit, to the end that the Port could use the material for diking purposes and when the low–lying property was filled with dredge spoils, it could cap the property for eventual development as industrial sites.

## PROCEDURES

To accomplish these purposes, in January 1979, the Port prepared and circulated to the appropriate agencies an environmental checklist and a proposed declaration of nonsignificance in attempted compliance with the State Environmental Policy Act of 1971 (SEPA), as set out in RCW 43.21C.030(2)(c). On February 14, 1979, the Port Commissioners passed Resolution 1800, which authorized the acquisition of the south shore properties as spoil disposal sites. On February 21, 1979, the final declaration of nonsignificance was made. On April 10, 1979, the Commissioners passed Resolution 1809, which amended the Port's Comprehensive Scheme of Harbor Improvements by incorporating the dredge spoils disposal project on the south shore properties. Thereafter, in August 1979, this action was commenced to acquire the aforementioned properties. There is no written record demonstrating that the Port

Commissioners had actually considered the project's potential environmental impact or evaluated alternative disposal sites, either when the declaration of nonsignificance was made or when the amendment to the Comprehensive Scheme approving the project was adopted. *See* RCW 43.21C.030(2)(c). However, no action was brought challenging the amendment of the Comprehensive Scheme within the 90–day period required by RCW 43.21C.080.

After hearing, the trial court entered its order in November 1979, denying an adjudication of public use and necessity. The court found and concluded that the acquisition of respondents' property was neither for a "public use," nor was it a "public necessity." The court further found the Port had not met its prima facie burden of establishing compliance with the procedural requirements of SEPA. The Port seeks review of that decision.

For an understanding of the issues on appeal, we consider first the role of the court in reviewing this type of administrative determination. In adjudicating public use and necessity, a trial court must make three separate but interrelated findings: (1) whether the proposed use in question is really a public use; (2) does the public interest require it; and (3) is the property to be acquired necessary to facilitate the public use. *Des Moines v. Hemenway*, 73 Wn.2d 130, 437 P.2d 171 (1968). While these three questions are interrelated, we consider them separately.

DID THE PORT ESTABLISH PUBLIC USE?

It is undisputed that the Port sought to acquire two of the tracts as a disposal site for dredging spoils that are dredged out of Grays Harbor shipping channels by the Port and the Corps of Engineers. The Port sought acquisition of the 40–acre borrow pit to obtain materials which could be used (1) to build dikes surrounding the disposal sites so as to prevent the accumulated spoils from draining back into and contaminating Grays Harbor, and (2) to cap the filled disposal sites, making them suitable for industrial expansion. The Port's long–range plan is to lease the sites to pri-

vate enterprise for industrial development, once the filling and capping is completed. The latter is projected to take 8 to 10 years.

■ The issue of whether a proposed acquisition is really for a public use is solely a judicial question, although a legislative declaration is entitled to great weight. *Des Moines v. Hemenway, supra.* Furthermore, what constitutes a public use depends on the particular facts in each case. *In re Port of Seattle,* 80 Wn.2d 392, 495 P.2d 327 (1972). *See* article 1, section 16 (amendment 9), Washington State Constitution.

The thrust of the arguments supporting the court's findings against the Port on the public use issue are these: (1) the Port has no authority to condemn property so that it can develop it and lease it to others for private use; (2) the Port has no authority to condemn a gravel pit where the materials may be acquired by purchase. We disagree, and believe the trial court erred in determining the Port did not establish "public use."

Article 8, section 8, (amendment 45) of the Washington State Constitution provides in pertinent part:

> The use of public funds by port districts in such manner as may be prescribed by the legislature for industrial development . . . shall be deemed a public use for a public purpose . . .

■ Consistent with this provision, the legislature has in RCW Title 53 given ports broad authority to promote trade and commerce by acquiring land and developing the land for industrial use. Specifically, RCW 53.08.040 allows a port district to improve its lands "by dredging, filling, bulkheading, providing waterways or otherwise developing such lands for sale or lease for industrial and commercial purposes." In order to carry out these purposes, the legislature has granted port districts broad powers of eminent domain. RCW 53.08.010 provides in pertinent part:

> A port district may acquire . . . by condemnation . . . all lands, property, property rights, leases, or easements necessary for its purposes and may exercise the right of

eminent domain in the acquirement or damaging of all such lands, property, and property rights . . . *in carrying out its purposes* . . .

(Italics ours.) The Port's resolution in which it declared the purpose of the acquisition clearly falls within the Port's constitutional and statutory powers. The argument that the future lease of the developed property to private industry constitutes a private rather than a public use is not well taken. That argument is contrary to the Port's constitutional and statutory authority, and the Supreme Court has rejected the proposition that ports may not lease their properties to private industry for appropriate public purposes. *In re Port of Seattle, supra.* In that case, the Supreme Court held that the subsequent lease of a port's property to private enterprise does not necessarily destroy the character of the use as public. Where the object sought to be accomplished is for a public purpose, the subsequent lease of the facilities to private industry is incidental to the main public purpose. We apply that principle and hold that the proposed industrial development is for a public purpose and the Port's plan to eventually lease the property to private industry is statutorily authorized and is incidental to the main public purpose. *In re Port of Seattle, supra.* The rationale of that case is fully applicable to the facts of this case.

■ Respondents Sell contend the Port has no authority to condemn the 40–acre tract solely for the purpose of obtaining materials for diking and capping the land acquired for the deposit of dredge spoils. It is true there is no specific statutory authority for condemning property for such a purpose. However, we believe the broad authority given ports to dike, cap, and develop property for industrial use carries with it implicitly the right to obtain the necessary materials through condemnation. *See Armstrong v. Seattle,* 180 Wash. 39, 38 P.2d 377, 97 A.L.R. 826 (1934); *State ex rel. Great N. Ry. v. Superior Court,* 68 Wash. 572, 123 P. 996 (1912).

■ While statutes relating to eminent domain are

strictly construed, it is not necessary that they cover in minute detail everything which may be done to carry out their purpose. Even though a power is not given in specific words, it may be implied if its existence is reasonably necessary to effect the purpose of the condemning authority. *State ex rel. Hunter v. Superior Court,* 34 Wn.2d 214, 208 P.2d 866 (1949). We hold the trial court erred in concluding the Port had not established that the property it sought to acquire by eminent domain was not for a public use, or that the Port lacked authority to acquire it for its public purposes.

PUBLIC INTEREST AND PUBLIC NECESSITY

■ The standard of judicial review of a declaration of public necessity differs from that applied to a declaration of public use. Whether a proposed acquisition is a public necessity presents a legislative question. The determination of the legislative body is conclusive unless the challenger is able to show actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud. *Seattle v. Loutsis Inv. Co.,* 16 Wn. App. 158, 554 P.2d 379 (1976). The burden of proving fraud or constructive fraud is on the objector. *In re Port of Seattle, supra.*

The trial court based its conclusion that constructive fraud was established on several findings, which are summarized:

1. Since private property owners had offered the Port easements for the deposit of dredge spoils, acquisition of fee title was unnecessary.

2. The Port presented no specific plan for improvement of the property once the disposal phase was completed.

3. The 40–acre tract containing the borrow pit contained far more material than was necessary for diking and capping purposes, and there were other gravel pits in the area where the Port could purchase gravel on a competitive bid basis.

4. The Port's real motive in acquiring the property was to avoid competition in the future for industrial activities

which would handle marine cargo in bulk from respondents' property.

5. Constructive fraud was established (a) when the Port failed to prepare an environmental impact statement when it amended its Comprehensive Scheme; (b) when it failed to actually consider the potential environmental consequences of the project in making its threshold determination of nonsignificance; and (c) when it failed to evaluate alternative disposal sites in adopting the 1976 and 1979 amendments to the Comprehensive Scheme of Harbor Improvements.

## EASEMENT V. FEE

Whether a legitimate public use should be accomplished by acquisition of an easement rather than a fee is a question on which reasonable minds can differ. Given the expense involved in diking the land and the Port's long-range plans for development of the property, the legislative choice is not arbitrary or capricious choice simply because a reviewing court would select a different option. *Lillions v. Gibbs,* 47 Wn.2d 629, 289 P.2d 203 (1955). *Seattle v. Loutsis Inv. Co., supra; State v. Kingman,* 5 Wn. App. 487, 487 P.2d 780 (1971). The legislature under constitutional authority has granted broad authority to port districts to determine the *means* by which it carries out its public purpose. It should also be noted that RCW 53.20.030 states that no improvement shall be constructed by a port district unless improvements when completed become the property of the port district.

## LACK OF SPECIFIC PLANS FOR FUTURE DEVELOPMENT

Port witnesses testified the Port is facing a shortage of land available for industrial or commercial use. After approximately 8 years, when the disposal sites are filled and capped, the land will be well suited for the expansion of Port facilities for the use of other industrial or commercial users whose presence would benefit Grays Harbor County. The absence of specific plans for this projected use

neither makes the plan speculative nor does it demonstrate lack of public necessity. The law requires only a reasonable necessity for the use within a reasonable time. *Port of Seattle v. Isernio,* 72 Wn.2d 932, 435 P.2d 991 (1967); *Port of Seattle v. Certified Mfg. Co.,* 66 Wn.2d 598, 404 P.2d 25 (1965). The Port's use of the property is immediate and not remote or speculative. The absence of specific and detailed plans for the future use of the property is not a fatal defect to the acquisition. Nor does the lack of specific plans establish arbitrary or capricious action where there is a well defined immediate use. *State ex rel. Wenatchee–Beebe Orchard Co. v. Superior Court,* 57 Wn.2d 662, 359 P.2d 146 (1961).

NECESSITY FOR CONDEMNATION OF THE BORROW PIT

We have already concluded the Port has authority to condemn property for the purpose of obtaining materials for diking and capping the land to be acquired. Given that authority, the legislative decision to condemn respondents' property is not arbitrary or capricious simply because the materials could be obtained elsewhere. *State ex rel. Great N. Ry. v. Superior Court, supra; Armstrong v. Seattle, supra.*

THE PORT'S ALLEGED MOTIVATION TO STIFLE
COMPETITION

We recently held that the condemnor's action cannot be arbitrary and capricious even if motivated in part by improper consideration, if an examination of the facts and circumstances of the proposed condemnation demonstrates a genuine need and if the condemnor in fact intends to use the property for the avowed purpose. *State v. Hutch,* 30 Wn. App. 28, 631 P.2d 1014 (1981). The need of the Port comes in part by its obligation to dredge the river channel and to deposit the spoils. This need was never disputed. There is also no question that the Port intends to dike the land, deposit the spoils on the land, cap it, and develop it for industrial sites. These are authorized uses. The alleged

improper considerations are immaterial. *State v. Hutch, supra.*

## SEPA Issues

The Port argues (1) that condemnation is exempt from SEPA, and (2) the trial court improperly allowed a collateral attack on SEPA grounds in this proceeding.

■ We agree with the Port's argument that the bare act of condemnation is not subject to the provisions of SEPA, despite suggestions in *State v. Brannan,* 85 Wn.2d 64, 530 P.2d 322 (1975), that SEPA considerations might have been relevant to a public use and necessity determination. Since the *Brannan* opinion was written, condemnation proceedings have been effectively removed from SEPA's ambit by WAC 197–10–170. This regulation provides for "categorical exemptions"—governmental activities which are exempted from the threshold determination and EIS requirements of SEPA. Included in these exempted actions is the purchase or acquisition of any right to real property by an agency. WAC 197–10–170(9)(a). Thus condemnation of real property, being acquisition of rights to the condemned property, is exempt from the provisions of SEPA. *Marino Property Co. v. Port of Seattle,* 88 Wn.2d 822, 830–31, 567 P.2d 1125 (1977); *State v. Hutch, supra.*

Unlike the condemnation action, the amendment of the Port's Comprehensive Scheme was not exempted from the SEPA requirements. *Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978). The Port attempted to comply with these requirements with a declaration of nonsignificance. However, there is no written record that demonstrates that the Port actually considered the environmental factors of the project and determined the environmental significance of these factors. Therefore, the Port has probably not met the requirements set forth in *Lassila v. Wenatchee, supra.*

However, even if we assume the Port violated the requirements of SEPA, condemnation proceedings are not the proper setting for a review of the Port's actions. This is clear from the Supreme Court's holding in *State v. Brannan, supra.* That was an appeal from an order of public use

and necessity allowing condemnation of property for a limited access highway. The property owners raised SEPA violations at the public use hearing. The Supreme Court noted that prior to the public use hearing the Washington State Highway Commission held a limited access hearing, in respect of which the commissioners entered findings and an order adopting the plan for the new highway. RCW 47.52-.137 provided that the determination of the highway commissioners became final 30 days after service on the property owners of copies of the findings and order, unless review was taken within that time. The property owners failed to petition for review within the 30–day limit. The Supreme Court held, first, that the condemnation hearing was not the proper place to subject the order of the highway commission to attack for failure to comply with SEPA. Second, they held that petitioner's action was barred by laches because it failed to pursue the appellate remedy prescribed by the limited access statute and the highway commission significantly changed its position by acquiring other adjacent properties in the interim. *State v. Brannan,* 85 Wn.2d at 73–74. Thus, neither collateral attack nor direct review was available to the petitioners in *Brannan.*

In the present case, collateral attack on the Port's attempted compliance with SEPA in amending its Comprehensive Scheme is unavailable for the reasons set forth in *Brannan.* The proper place to raise the issues of the environmental impact of the Port's project is at the administrative level and not at the hearing on the application for public use and necessity. To hold otherwise would be to allow an impermissible collateral attack on the prior administrative determination. *State v. Hutch,* 30 Wn. App. at 40; *King County v. Burhen,* 29 Wn. App. 497, 500, 628 P.2d 1341 (1981).

Nor do the respondents have the avenue of direct attack open to them. The SEPA statute of limitations, RCW 43.21C.080, bars any appeal of the Port's amendment to the Comprehensive Scheme. The statute begins to run after publication of notice of the action to be taken by the gov-

ernmental agency. The Port published notice of the proposed amendment to its Comprehensive Scheme on March 14 and 21, 1979. From the latter date, RCW 43.21C.080 provides 90 days in which the proposed amendment might have been challenged. Thus, the respondents' right of direct attack was extinguished by the statute of limitations in June 1979. The Comprehensive Scheme was amended on April 10, 1979, and the present action was commenced with the Port's petition for public use and necessity in August 1979. The amendment to the Comprehensive Scheme had not been appealed at that time, nor has any appeal been taken since. The respondents are therefore barred from appealing the amendment by RCW 43.21C.080 for failing to bring the appeal within 90 days from March 21, 1979.

The trial court is reversed and the case is remanded for entry of an order of public use and necessity.

REED, C.J., and PETRIE, J., concur.

Reconsideration denied January 29, 1982.

Review denied by Supreme Court April 9, 1982.