[No. 12311-4-I. Division One. October 3, 1983.]

*In the Matter of the Petition for Condemnation of* THE PORT OF SEATTLE.

CHIYODA CHEMICAL ENGINEERING AND CONSTRUCTION COMPANY, LTD., *Appellant,* v. THE PORT OF SEATTLE, *Respondent.*

*Short & Cressman* and *Douglas Hartwich,* for appellant.

*Bogle & Gates* and *Dale B. Ramerman,* for respondent.

SWANSON, J.—Chiyoda Chemical Engineering and Construction Company, Ltd. (Chiyoda) appeals from an order of public use and necessity that allows the Port of Seattle (Port) to take by eminent domain a 20–acre parcel of land owned by Chiyoda located along the eastern side of the Duwamish River. (See the following map.) Chiyoda contends that the Port's exercise of its power of eminent domain in seeking to acquire Chiyoda's property is not authorized by statute, the use authorized does not constitute a public use, and further, there is no reasonable necessity for its acquisition.

Essentially this appeal challenges the authority of the Port to acquire by condemnation nonmarginal property as such property is defined in RCW 53.25.030 and sell or lease such property to other private business entities in furtherance of its program of relocation and industrial development of waterway resources. The Port asserts that it is

authorized by statute to acquire land for industrial development necessary to accomplish that purpose.

The Port of Seattle is a port district coextensive with the boundaries of King County and founded in 1911 as authorized by the 1911 Legislature. Beginning in the early 1960's, the Port actively developed containerized shipping facilities and is now the second largest containerized port in the United States. Chiyoda is a foreign corporation with industrial operations worldwide. The subject property was acquired by Chiyoda from the City of Seattle in 1972.

Following enactment of the industrial development district statute in 1955, RCW 53.25, authorizing creation of industrial development districts within the port district, the Port on September 14, 1962 enacted resolution 2111 establishing the Lower Duwamish Industrial Development District (LDIDD). The resolution designated that district as part of the comprehensive scheme of harbor improvements. The Port does not own all of the property in the LDIDD; much of it is owned and developed by private entities. The LDIDD encompasses a 12–square–mile area extending north from South 118th Street along both sides of the Duwamish River and extending east and west around Elliott Bay from Harbor Island and includes the Chiyoda property.

A new high bridge for Spokane Street is under construction and will permit large ships to have easy access to the Duwamish Waterway south of the bridge. Because of the new access provided by the bridge, the Port desires to develop further the Duwamish Waterway south of the bridge for maritime facilities. The Duwamish Waterway is a prime area for development of maritime facilities. The Port intends to develop the Lower Duwamish River for shipping and maritime facilities in cooperation with the Corps of Engineers. The Port considers acquisition of the Chiyoda property necessary to maritime development.

On May 26, 1982, the Port commenced condemnation proceedings in superior court against Chiyoda's 20–acre parcel of property along the Duwamish Waterway. In its petition for an order of public use and necessity, the Port relied on resolution 2111 that established the LDIDD. At the time resolution 2111 was passed, the City of Seattle owned the property and used it as a sewage treatment facility. Chiyoda purchased the property from the City in 1972. After the purchase, Chiyoda demolished the structures on the property, graded the property, and installed some riprap along the Duwamish River at a cost of $500,000, but has not otherwise improved the property. Chiyoda planned to construct a fabrication plant on its

property for heavy petroleum processing equipment which would be shipped worldwide. The 1973 oil embargo and OPEC induced changes preventing such development. Thereafter, Chiyoda has caused development and market feasibility studies to be made regarding property and plans development for a water oriented use for itself or private sale to a third party for such a development. In about 1976 a small portion of the Chiyoda property was used as a disposal site for PCB contaminated dredge material removed from the Duwamish River.

It is the opinion of Port Director of Operations Larry Killeen and Commissioner Merle Adlum that the Lower Duwamish will be developed within the next 10 years or so for both barge and deepwater shipping and that the subject property, along with adjacent property known as Terminal 106 already owned by the Port, may be developed for these purposes, although no plan or development program has been adopted or recommended by the Port in this regard.

It is not disputed that the Port seeks to acquire the Chiyoda property as part of its continuing development of the Port of Seattle. More specifically, the Port seeks to integrate the Chiyoda site with Terminal 106 located on the north side of the Chiyoda property and to use the land for bulk oil and tallow storage or as a container repair facility. For more than 2 years the Port has been negotiating with Chevron U.S.A. Inc. for the use by Chevron of the east half of the subject property as a bulk oil plant. Those discussions have been carried on as a part of negotiations for acquisition by the Port of Chevron's existing facility on Piers 32 and 33 for the development by the Port as a container handling facility. The Port is seeking to acquire the Chiyoda property as a possible site for Chevron Oil U.S.A. to relocate its bulk oil plant. Chevron Oil U.S.A. prefers the Chiyoda property to any other property for such purpose. The Port advised Chevron U.S.A. that it would acquire the Chiyoda property either by negotiation or condemnation and either lease, sell, or exchange a portion of the Chiyoda property with Chevron U.S.A. Because Chevron does not

need direct water access, the Port believes the relocation of Chevron would result in a more efficient utilization of waterway resources. The trial court specifically found:

In order for the Port to develop lands on Harbor Island and along the east and west waterways for deep water shipping facilities, it may be necessary for property owners and users in these areas, who need water access but do not need a location on deep water, to relocate along the Duwamish south of Spokane Street.

Finding of fact 16.

The court then entered finding of fact 17, the only finding claimed to be erroneous, which states, "The Port Commission found that the proposed taking was necessary and the court so finds."

After making these findings of fact, the court concluded as follows:

1. The subject property is not "marginal land" as that term is used in RCW 53.25.

2. In acquiring and developing land under RCW 53.25, a port district is not limited to marginal lands, and the Port of Seattle properly proceeded under RCW 53.25 in commencing condemnation proceedings in this case.

3. So long as property is used for activity that a port district by statute is authorized to conduct, the fact that the property will be leased to a private party does not render the use a nonpublic use.

4. It is a public use for the Port to acquire the Chiyoda property to replace business property sought by the Port for the Port's terminal 30 project.

5. The Port of Seattle plans to use the property for activities which port districts are authorized to engage in under RCW 53.25, and said uses are public uses.

6. The public interest requires the uses to which the Port of Seattle plans to put the property.

7. There is no basis upon which the court can find that the Port Commission finding of necessity is fraudulent or is arbitrary and capricious.

Chiyoda assigns error to all but two of the trial court's conclusions of law, conceding only that the court correctly determined its property to be nonmarginal and that a private lease of the property for a use authorized by statute

does not render the use nonpublic.

From these determinations and following entry of the order of public use and necessity, Chiyoda appeals and seeks review by this court.

■ Before discussing Chiyoda's specific claims of error, it is useful to begin by defining the trial court's role in this type of proceeding. We stated in *In re Port of Grays Harbor*, 30 Wn. App. 855, 859, 638 P.2d 633 (1982):

> In adjudicating public use and necessity, a trial court must make three separate but interrelated findings: (1) whether the proposed use in question is really a public use; (2) does the public interest require it; and (3) is the property to be acquired necessary to facilitate the public use.

As article 1, section 16 of our constitution makes clear, the question of whether a proposed use is really for a public use is a judicial question. Const. art. 1, § 16 (amend. 9) states:

> § 16 Eminent domain. Private property shall not be taken for private use . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: . . .

However, a port's determination of necessity, that is, does the public interest require it and is the property to be acquired necessary to accomplish a public use, is a legislative, as opposed to a judicial question. *Des Moines v. Hemenway*, 73 Wn.2d 130, 139, 437 P.2d 171 (1968). Such a legislative determination is conclusive unless a challenger is able to prove actual or constructive fraud, *see In re Port of Seattle*, 80 Wn.2d 392, 398, 495 P.2d 327 (1972).

■ As to the exercise of eminent domain powers, a municipal corporation may exercise that power only as authorized by the Legislature. Our Supreme Court in *In re Seattle*, 96 Wn.2d 616, 629, 638 P.2d 549 (1981) explains:

> A municipal corporation's power to condemn is delegated to it by the legislature and must be conferred in express terms or necessarily implied. Statutes which del-

egate the State's sovereign power of eminent domain to its political subdivisions are to be strictly construed. *Des Moines v. Hemenway,* 73 Wn.2d 130, 437 P.2d 171 (1968); *State ex rel. Devonshire v. Superior Court,* 70 Wn.2d 630, 424 P.2d 913 (1967). However, as we said in *Devonshire,* a statutory grant of such power is not to be so strictly construed as to thwart or defeat apparent legislative intent or objective.

RCW 53.08.010 gives port districts the power to "acquire . . . by condemnation . . . all lands, property, property rights, leases, or easements necessary for its purposes . . ." That statute also says that a port district shall exercise that right in the same manner and by the same procedure as provided for cities of the first class. The exercise of eminent domain by first class cities is provided for in RCW 8.12.

In similar fashion RCW 53.25, the industrial development district statute, gives port districts eminent domain powers for acquiring land for industrial development districts. In this proceeding, the Port relied upon the provisions of RCW 53.25 and alleged that the uses planned for the subject property fall under that statute.

Chiyoda's primary attack on the trial court's order of public use and necessity is based upon the argument that there is no applicable legislative authorization for this condemnation action. Without legislative authorization applicable to this taking, Chiyoda says the Port has no power to condemn the subject property and specifically asserts that the statute the Port relied upon below, RCW 53.25, does not furnish the necessary authority.

In making this argument, Chiyoda recognizes that RCW 53.25 contains two grants of eminent domain authority, but claims that neither one supports this taking.

RCW 53.25.190, the first grant of eminent domain authority, limits the authority to condemn land for industrial development to "marginal land" as such term is defined in RCW 53.25.030. Assuming the trial court correctly found the subject property to be nonmarginal land, this section furnishes no statutory authority to support the court's action.

The second grant of eminent domain authority is contained in RCW 53.25.100 which refers to "all lands" without distinguishing between marginal or nonmarginal and so includes the subject property.[1] However, our Supreme Court in *Hogue v. Port of Seattle,* 54 Wn.2d 799, 341 P.2d 171 (1959) declared RCW 53.25.100 null and void. The court stated in *Hogue,* at page 837:

> The provisions of § 10 of the act [RCW 53.25.100], relating to the condemnation of land *other than* marginal lands, are null and void for the reason that they purport to authorize the condemnation of such land for a private purpose, to wit, the development and sale thereof to private entities for use as industrial sites.

A review of the history of RCW 53.25 demonstrates that the 1955 Legislature meant to broaden port districts' powers of condemnation by deleting the limiting factor of the provisions of the Laws of 1939, ch. 45, that granted such power, and did so by retaining the general powers of port districts as included in the 1939 law and created a new category of "marginal lands" that would be available for development by port districts. This discussion in *Hogue v. Port of Seattle, supra* at 828, supports this analysis:

> As above stated, §§ 5, 6, and 10 [RCW 53.25.050, .060, and .100] have no relation to marginal lands. The powers conferred by these sections were previously contained in the industrial development act of 1939 (Laws of 1939, chapter 45, p. 130, as amended by Laws of 1943, chapter 166, p. 535). Under the 1939 act, the power of eminent domain relative to the acquisition of property necessary for industrial development purposes was expressly limited to land which had not been improved by the owner or his predecessors to the extent of $25,000 or more. No

---

[1]RCW 53.25.100 authorizes port districts where industrial development districts have been established "to acquire by purchase or condemnation or both, all lands, property and property rights necessary for the purpose of the development and improvement of such industrial development district and to exercise the right of eminent domain in the acquirement or damaging of all lands, property and property rights . . . and generally to exercise with respect to and within such industrial development districts all the powers now or hereafter conferred by law upon port districts in counties of the first class . . ."

reference to marginal lands was contained in that statute. The 1955 act, which repealed the 1939 act, omitted the limitations on the power of eminent domain imposed by the 1939 act. The 1955 act replaced the 1939 act relating to industrial development districts and re-enacted similar provisions with a prologue consisting of legislative declarations and the creation of marginal lands (§§ 1, 2, and 3). See *Port of Tacoma v. Taxpayers,* 53 Wn. (2d) 734, 336 P. (2d) 872 (1959).

We are persuaded that the 1955 act was indeed intended to grant the court additional power to condemn the new category of marginal land while still retaining its power to condemn "all land" necessary for industrial development. But as previously noted, the *Hogue* case dealt a fatal blow to the constitutionality of that statute as it related to both marginal and nonmarginal lands in the circumstances of that case. The *Hogue* court reasoned that the authority provided in RCW 53.25.100 to condemn land for industrial development by taking the property of one owner, improving it, and then placing it in the hands of another owner for use as an industrial site, thereby devoting the land to a better economic use, was a private rather than a public use and consequently violated the constitutional limitation of the power of eminent domain.

■■ Following the *Hogue* decision, the Washington Constitution was amended in 1966. Article 8, section 7 was amended by adding the following section:

> The use of public funds by port districts in such manner as may be prescribed by the legislature for industrial development or trade promotion and promotional hosting shall be deemed a public use for a public purpose, and shall not be deemed a gift within the provisions of section 7 of this Article.

Const. art. 8, § 8 (amend. 45). The amendment recited above is a constitutional declaration that public funds may be used for industrial development and that such use is a public use for a public purpose. Our Supreme Court in *In re Port of Seattle,* at 397 n.2, recognized that amendment 45 altered the effect of the *Hogue* decision by noting:

Further, the impact of *Hogue v. Port of Seattle,* 54 Wn.2d 799, 341 P.2d 171 (1959) was substantially modified by the adoption of article 8, section 8 (amendment 45) to the Washington Constitution which reads in pertinent part:

> The use of public funds by port districts in such manner as may be prescribed by the legislature for industrial development or trade promotion . . . shall be deemed a public use for a public purpose . . .

Nevertheless Chiyoda argues that the amendment does not revive RCW 53.25.100. According to Chiyoda, a statute which has been held unconstitutional becomes inoperative and the law stands as though the unconstitutional legislation had never been enacted. Pursuant to this contention, the passage of a constitutional amendment amending a provision under which the statute was invalidated will not revive the previously declared unconstitutional legislation. Chiyoda claims the statute must be reenacted. We disagree.

The amendment was passed to cure the court's objection to RCW 53.25.100. The 1965 Legislature responded to the problems created by the *Hogue* decision and passed Senate Joint Resolution 25 (SJR 25). See Official Voters Pamphlet (1966).[2] Explanatory statements in the voters' pamphlet advised the voters of the impact the Supreme Court decision had on industrial development by a port district. It cannot be doubted that amendment 45 was intended to remove constitutional restrictions on the type of development condemned in *Hogue.*

The suggestion that in order to make RCW 53.25.100 operative, the Legislature must reenact it is not reasonable and is not supported by prior decisions. *See Busch v. Turner,* 26 Cal. 2d 817, 161 P.2d 456 (1945); *People ex rel. McClelland v. Roberts,* 148 N.Y. 360, 42 N.E. 1082 (1896);

---

[2]The Port complains that this specific issue was not raised below and should not be considered on appeal. Because the issue was not raised in the trial court, the voters' pamphlet was not offered as an exhibit. To meet Chiyoda's argument on appeal, the Port included the voters' pamphlet in an appendix to the brief. We consider the issue because of its importance and in the interest of fairness take judicial notice of the Official Voters Pamphlet.

*In re Williamson,* 116 Wash. 560, 200 P. 329 (1921). Further, the Legislature did act to restore vitality to the statute by passing SJR 25. Subsequent passage of the amendment removed the constitutional restrictions. Between the decision date of *Hogue* and when the amendment became effective, the statute had limited application, but once the amendment became effective, the statute which had not been repealed was subject to a broader interpretation. Therefore, private lands may be condemned and placed in other private hands. Thus the amendment changed the character and scope of what is a public use as applied to port districts and thereby changed the scope of the statute.

As was noted at the beginning of this discussion, whether a taking is a public use is a judicial question; however, we have, by the terms of amendment 45, a constitutional authorization in the form of a declaration that use by a port district of public funds for industrial development "shall be deemed a public use for a public purpose." We conclude that the Port had authority under RCW 53.25.100 as enlarged by amendment 45 to condemn the Chiyoda property.

Chiyoda next contends that the Port's 1962 resolution does not specifically identify the Chiyoda property or any development thereon to satisfy the comprehensive plan requirement which is a condition precedent to exercising the power of eminent domain under RCW 53.25.090.

In 1912 the Port's comprehensive scheme of harbor development was established by resolution 17. It defined seven units by geographic location; however, this resolution has been modified many times. The present comprehensive scheme includes unit 20 which is one unit within the LDIDD and includes the Chiyoda property within its geographic boundaries.

An argument similar to that advanced here by Chiyoda was made in *In re Port of Grays Harbor,* 30 Wn. App. 855, 638 P.2d 633 (1982), when the property owner claimed the Port lacked plans for future development. Witnesses in the

*Grays Harbor* case testified that the land would be diked, used as a disposal site for dredge material and ultimately used for industrial or commercial users. We said in *In re Port of Grays Harbor,* at pages 863–64,

The absence of specific plans for this projected use neither makes the plan speculative nor does it demonstrate lack of public necessity. The law requires only a reasonable necessity for the use within a reasonable time. The Port's use of the property is immediate and not remote or speculative. The absence of specific and detailed plans for the future use of the property is not a fatal defect to the acquisition. Nor does the lack of specific plans establish arbitrary or capricious action where there is a well defined immediate use.

(Citations omitted.)

 Here the Chiyoda property was encompassed by resolution 2111 passed in 1962 which established the LDIDD. The subject property was included as a part of the comprehensive scheme, though not specifically mentioned therein because it was then owned and operated by the City of Seattle. This scheme provides that the Port proceed with construction and development of needed harbor and waterway improvements, and the property not needed for those improvements will be developed, improved, and put to use by the Port to obtain maximum industrial development. The Port's comprehensive scheme provides that the Port will develop sites as they become available to meet the present and future needs of the Port in order to promote and develop a volume of commercial traffic. Resolution 2850 attached to the Port's petition herein sets forth the Port's need for sites for marine based industries and the Port Commissioner's determination that the Chiyoda property is necessary for the furtherance of the purposes of the LDIDD as defined in RCW 53.25. For example, testimony offered in support of the petition indicates that the Chiyoda property is not at its maximum industrial development, being essentially vacant, and that the Port plans to use the Chiyoda land to lease or sell the east 10 acres for relocation of the Chevron facilities so that the Port may

acquire the Chevron outer harbor area property for construction of a new container facility. The Port's interim plan for the remaining 10 acres involves leasing for the development of several marine terminal facilities requiring relocation or as a barge loading facility. Testimony was also presented regarding long–term plans including the possibility of consolidating the Port's other property to create a large tract for Port operations. Consequently, we have very specific near–term plans coupled with more general long–term plans for development of this property. Ample evidence supports the trial court's finding of "reasonable necessity".

The appellant seems to argue that the Port's decision was so arbitrary and capricious as to amount to constructive fraud. While the Port did not pass resolution 2111[3] for the specific development or use of the Chiyoda property, we believe the resolution is sufficient when coupled with resolution 2850,[4] which outlines the Port's plans for the use of

---

[3]Resolution 2111 contains the following statements:

"(6) The acquisition by the Port of the land areas and properties as shown in the aforesaid Comprehensive Scheme will permit the Port to proceed with the construction and development of needed harbor and waterway improvements and will further make available land areas which are required by the Port for reasonable future harbor and waterway improvements and which will be available during an interim period for industrial development and use.

"(7) All land areas within the Industrial Development District which are or may become the property of the Port of Seattle and which are not needed by the Port for harbor and waterway improvements shall be developed, improved, used and put to use by the Port pursuant to the powers granted by Chapter 53.25 of R.C.W. with the object of obtaining maximum industrial development and use from such properties within the District."

[4]Resolution 2850 contains the following:

"2. The Port's acquisition of the Chiyoda Property is for public use and purpose as follows: for the public convenience and necessity; for the peace, security and safety of the people within the jurisdiction of the Port of Seattle and this state; and for the furtherance of the purposes of the Lower Duwamish Industrial Development District set forth in RCW Ch. 53.25 and Port Commission Resolution No. 2111, including without limitation providing for the Port, its present and prospective tenants and customers, and other sites for marine–oriented industries generating jobs and other contributions to trade and commerce and the economy of King County; . . ."

the LDIDD and the Chiyoda property specifically. *See In re Port of Grays Harbor, supra* at 863–64. Unlike the situation in *Port of Everett v. Everett Imp. Co.,* 124 Wash. 486, 214 P. 1064 (1923), in which the Port essentially recited statutory provisions and said little more about its plan for the land it wished to acquire, the aforementioned resolutions constitute a sufficient comprehensive plan. Appellant has not met its burden to prove constructive fraud.

We affirm and uphold the order of public use and necessity.

CORBETT and SCHOLFIELD, JJ., concur.